Argued October 10, 1939; modifed February 6, 1940

KINNEY ET AL. *v.* UGLOW ET AL.

(98 P. (2d) 1006)

In Banc.

*Roy A. McCourry*, of McMinnville, and *Charles W. Swan*, of Vale, for appellants.

*Oscar Hayter*, of Dallas (Fred W. Calef, of Independence, on the brief), for respondent.

BAILEY, J. This suit was instituted by Charlotte Vaughn Kinney and Alice Wood, two of the beneficiaries of the trust created by the last will and testament of Abel Uglow, deceased, against John C. Uglow, trustee, and the remaining beneficiaries under the trust. All the defendants except the trustee defaulted. From a decree overruling many of the plaintiffs' exceptions to the account of the trustee, the plaintiffs have appealed.

Abel Uglow died April 6, 1925. On April 16 of that year his will, dated February 1, 1917, and the first codicil, dated August 20, 1920, were admitted to pro-

bate. This codicil affects only the disposition of one-sixth of the estate upon the death of Mary Cressy McDonald, one of the daughters of the testator, and is not material to the issues in this case. A second codicil to the will was declared invalid.

The three daughters of the testator, who are mentioned in the will by their maiden names, are now married and in referring to them we shall use their present names.

By the terms of his will, Abel Uglow devised to his wife, Margaret Uglow, the "home place", consisting of approximately eighteen acres, "to be hers during the term of her natural life and at her death to go to all my heirs then living, share and share alike".

The third paragraph of the will is as follows:

"As soon as my estate is administered upon, it is my will that the whole of said estate, after the above bequest to my wife has been turned over to her, shall be turned over to a trustee hereinafter named, to be by him held and disposed of as follows, to-wit:"

It is then directed, by paragraph IV, that the following sums be paid: to the testator's wife, Margaret Uglow, $50 per month; to his son, John C. Uglow, and to his daughters, Mary Cressy McDonald, Alice Misner Wood and Pearl Johnson Turner, each $25 per month; that when his adopted son, Wendal A. Sanders, should reach the age of seventeen years there should be paid to the testator's widow, to be used for the maintenance and education of such adopted son, $25 per month, until his attaining the age of twenty-one years, at which time that amount should be paid direct to him; and that when the testator's granddaughter, Charlotte Vaughn Kinney, should reach the age of seventeen years there should be paid to her guardian

for her care and education the sum of $25 per month, that amount to be paid direct to her upon her reaching the age of twenty-one years.

The will then provides that when the beneficiaries named in the trust, with the exception of the widow, shall arrive at certain designated ages, one-sixth of the net income of the trust shall be paid to each such beneficiary. The ages of these beneficiaries at the time of Abel Uglow's death, April 6, 1925, and the age at which the will (executed February 1, 1917) directed that each beneficiary should receive one-sixth of the net income of the estate are here tabulated:

| Age at testator's death | Age appointed to receive one-sixth net income |
|---|---|
| John C. Uglow, 50 years | 50 years |
| Mary Cressy McDonald, 48 years | 50 years |
| Alice Misner Wood, 42 years | 45 years |
| Pearl Johnson Turner, 38 years | 40 years |
| Wendal A. Sanders, 22 years | 30 years |
| Charlotte Vaughn Kinney, 16½ years | 30 years |

The ages mentioned as of the time of the testator's death are approximate, without regard to months and days over or under the number of years stated.

Paragraph XIII of the will is as follows:

"In case the income from my estate should not be sufficient, at the time of my death to pay the foregoing bequest mentioned in paragraph 'IV' of this my last will and testament, in full, then each of said heirs shall receive a proportionate part until such time as the income shall be sufficient to pay the same in full; and in case it should be sufficient to more than pay such bequests in full, the overplus shall be added to the principal and reinvested in some safe, interest-bearing security, approved by the court having jurisdiction hereof."

John C. Uglow, named in the will both as executor and as trustee, was appointed and qualified as such executor April 16, 1925.

The inventory filed by the executor showed property belonging to the estate appraised at $102,068.18, of which amount $39,500 was the appraised value of the real property. This realty consisted of business and residential properties, all located in the city of Dallas. Three of the six parcels were business properties.

On April 5, 1926, Margaret Uglow, widow of the decedent, filed in the probate proceedings a document in which, after setting forth that she was the widow of the decedent and a beneficiary under his will, she stated:

"That the provisions of said last will and testament aforesaid are not satisfactory to your petitioner and she therefore waives her rights under said last will and testament and elects to take her dower interest under the general laws of the state of Oregon.

"That your petitioner has never had set aside to her, the homestead as provided by law, and that at the time of the death of said Abel Uglow the family of deceased were living on the eighteen-acre tract of land mentioned in the inventory and appraisement, and the same was and now is the homestead of the family of deceased, and the same lying and being in the eastern part of the city of Dallas, Oregon, and being a tract of land not laid off in lots or blocks."

She then requested that she be awarded a dower interest in the estate of the deceased and that the homestead, consisting of eighteen acres, more or less, "be awarded to her as her exempt property as provided by law".

Nothing was done for a considerable length of time, concerning Margaret Uglow's request to have the homestead set aside to her as her separate property. In the interim, on November 30, 1927, the executor filed his final report, the material part of which is as follows:

"Balance on hand Dec. 1-1927 $17,741.82
Principal from sale of American
    Druggist stock                $12,500
Waverly Club bonds called           500

                                 ────────
                                 13,000
Balance in bank subject to distribution    4,741.82
Amount subject to re-investment          $13,000.00

"That all claims against said estate that have been presented or that have come to the knowledge of your petitioner have been settled in full and your petitioner knows of no reason why said estate should not now be closed and the property subject to distribution turned over to the devisees who are entitled to the same and the principal of the estate turned over to the trustee as provided for in the will of the deceased.

"That the heirs at law and the devisees under the will of the said Abel Uglow, deceased, are as follows, to wit:

"His widow, Margaret Uglow, a dower interest, she having renounced her rights under the will. . . "

Then follow the names of the other beneficiaries.

The order approving the final account was entered December 31, 1927. In so far as material here, it thus reads:

"Balance cash on hand Dec. 1st, 1927, $17,741.22.

"That of the above amount the sum of $12,500 is principal from the sale of 'American Druggist' stock and the sum of $500 is principal from 'Waverly Club bonds' called and would not be subject under the terms of the will of the said Abel Uglow to distribution at

this time, but would be reinvested in some approved sureties, bonds or other interest bearing securities.

\* \* \* \* \*

"That there is now on deposit in the Dallas City bank the sum of $4,741.82 which would at this time be subject to distribution to the devisees as provided in the last will and testament of the said Abel Uglow, deceased.

"That the heirs at law and only heirs and devisees under the will are as follows, to wit:"

The names of the heirs at law and beneficiaries under the will are set forth, with a notation concerning her dower interest after the name of Margaret Uglow, widow of the testator. It is then ordered "that the executor make distribution under the terms of the will of the money applicable thereto; and that when the said executor who is named in said last will and testament as trustee shall file receipts for the above distribution together with confirmation of his appointment as such trustee by the judge of the circuit court of Polk county, Oregon, and file his approved undertaking in said court, then this administration shall be closed."

The order further recites, "that Margaret Uglow, widow of the said Abel Uglow, has never had set apart to her the exempt real estate, although long ago applied for", and in the order three commissioners are appointed "to view, survey and report on the exempt property to be set aside to the widow".

We find in the record no further order of the court in reference to the homestead. It is asserted by counsel, however, that an order was entered attempting to set aside to the widow a tract of approximately two acres. Mrs. Uglow died November 25, 1936, some two and one-half years after this suit was started.

On January 16, 1928, John C. Uglow as executor paid to Mary Cressy McDonald, Pearl Johnson Turner, Alice Misner Wood and John C. Uglow individually the sum of $1,157.95 each, which payments the executor avers were made by him pursuant to his final report as executor and the order of the court thereon based.

John C. Uglow on February 1, 1928, filed a petition in the circuit court of the state of Oregon for Polk county, asking that in accordance with the terms of the will he be appointed trustee of the estate of Abel Uglow, deceased. In the petition he stated that the rents and profits of the estate amounted to approximately $465 a month, or an aggregate of $5,580 per year. On the same date an order was entered appointing John C. Uglow as such trustee.

The inventory of the assets of the estate filed by the trustee February 1, 1928, showed cash in the bank amounting to $13,463.42; bonds of Morgan-Bushong Investment Company, $3,500; 250 shares of the common stock of Tillamook Timber Company of the par value of $100 per share, $25,000; Willamette Southern Railway bonds, $9,000; and city of Raymond, Washington, local improvement district warrants of the face value of $2,500, with a notation that the same "had been declared illegal by the courts and were appraised as worthless". The remainder of the estate consisted of six tracts of real property in Dallas of the total value, as stated in the report, of $36,500. The eighteen-acre tract is referred to in the inventory as follows: "property at the corner of Uglow and Miller avenues, $7,500, less widow's homestead set off by court, $3,000", with $4,500 remaining as the value of the trust estate's interest in this property. The total value of the trust

estate as shown by this inventory was $87,563.42 as of February 1, 1928.

The county court on April 17, 1928, entered an order closing the estate of Abel Uglow, deceased, discharging the executor thereof and transferring to the circuit court for Polk county the administration of the trust estate.

This suit was instituted by the plaintiffs on May 1, 1934, and thereafter an order was made requiring the defendant trustee to render an accounting. As the first report filed by him was insufficient, other accounts were rendered, and finally on February 15, 1936, the trustee filed a report of the trust estate for the period beginning February 1, 1928, and ending December 31, 1935. Numerous objections to the trustee's accounts were filed by the plaintiffs.

The first of those objections is that the trustee failed to recover from John C. Uglow as executor the sum of $4,645.75 which, the report of the executor indicates, the latter had on deposit as cash in the bank in January, 1928, over and above the amount which as such executor he delivered to himself as trustee.

In presenting this matter to the court the plaintiffs in their brief continually refer to the sum of $4,741.82 as the amount which John C. Uglow as executor failed to deliver to John C. Uglow, trustee. They apparently seize upon this particular amount because the executor in his final report to the court recited that the balance on hand was $17,741.82, of which amount $13,000 was realized from the sale of assets of the estate and the remainder, $4,741.82, was income, subject to distribution to the "devisees" under the will. The executor distributed a total of $4,631.80 in cash, paying $1,157.95 to each of four beneficiaries under the will. There is

no evidence that the difference between $4,741.82 and this sum of $4,631.80 was not turned over by the executor to the trustee.

We are first called upon to decide whether John C. Uglow as executor should have turned over to John C. Uglow, trustee, the sum of $4,631.80 as part of the corpus of the estate, instead of paying that amount to beneficiaries under the will.

It would appear from the record in this case that all parties concede, or at least do not seriously question, that the $4,741.82 mentioned in the final report was income realized by the executor during the administration of the estate and was not a part of the principal of the estate.

We have hereinabove quoted in full paragraph XIII of the will. It is therein provided that should the income from the decedent's estate be insufficient at the time of his death to pay the bequests mentioned in paragraph IV of the will, then each of his "heirs shall receive a proportionate part until such time as the income shall be sufficient to pay the same in full". The bequests mentioned in paragraph IV include a monthly payment of $50 to the widow of the testator during her life, and to six other named beneficiaries, either directly or for their use, the sum of $25 a month each until they arrive at designated ages. Paragraph XIII further provides that in case the income should be more than sufficient to pay such bequests in full, the overplus should be added to the principal.

The monthly payments of $25 each, as will be noted in what has hereinabove been said, continue only until such time as the respective beneficiaries other than the widow arrive at certain designated ages, and upon reaching the respective age named, each of those bene-

ficiaries is to receive one-sixth of the income of the estate for the remainder of his life. No part of the corpus of the estate is to be received by any of the named beneficiaries. Upon the death of any beneficiary, one-sixth of the estate is to go to his or her bodily heirs, if any, and if there be no heirs, then to remain a part of the testator's estate.

■ In construing wills the first duty of the court is to ascertain, if possible, the intention of the testator. Taking the present will in its entirety, it is evident that Abel Uglow intended that the provisions thereof as to payment of income from the estate to the beneficiaries named should be effective as of the date of his death and not the date of delivery of the estate to the trustee. Paragraph XIII of the will refers to the income from the testator's estate at the time of his death and provides that if such income be insufficient to pay the monthly allowances specified in paragraph IV of the will, the heirs shall receive a proportionate part thereof until such time as the income shall be sufficient to pay the allowances in full. There is no indication in the will that the income received by the executor shall become a part of the corpus of the trust estate, except that such surplus as may remain after paying the allowances provided in paragraph IV of the will is to be added to the trust estate.

■ The general rule is well established that when property is devised or bequeathed in trust to pay the income therefrom to a beneficiary for life or for a limited time, such beneficiary is entitled to payment of the income from the death of the testator, unless otherwise provided in the will: *Estey v. Commerce Trust Company*, 333 Mo. 977, 64 S. W. (2d) 608; *In re Leitsch's Will*, 185 Wis. 257, 201 N. W. 284, 37 A. L. R. 547; *Ban-*

*croft v. Security Company,* 74 Conn. 218, 50 A. 735; *Hewitt v. Hicock,* 96 Conn. 176, 113 A. 172; *Creed v. Connelly,* 272 Mass. 241, 172 N. E. 106; *Poole v. Union Trust Co.,* 191 Mich. 162, 157 N. W. 430, Ann. Cas. 1918E, 622; *Equitable Guarantee & Trust Co. v. Mc-Curdy,* 11 Del. Ch. 156, 98 A. 220. See also: annotations, 70 A. L. R. 636 and 105 A. L. R. 1194; 2 Perry on Trusts and Trustees, 6th Ed., § 550, note *a.*

The reason for the above rule, as often expressed, is that the life tenant ranks first in the consideration of the testator, and a contrary construction would take from him a part of his income and add it to the corpus of the estate, thereby at the expense of the life tenant increasing the estate of the remaindermen.

The supreme court of Wisconsin in the case of *In re Lyons' Estate,* 183 Wis. 276, 197 N. W. 710, held that inasmuch as the testator devised and bequeathed to trustees the remainder of his estate "to hold, manage and invest the same" and "to pay over the net income to my wife, Mary Lyons, during her life", the income from the trust estate did not "begin to accrue until the estate" was "assigned to the trustees".

In the later instance of *In re Leitsch's Will,* supra, that court referred to the decision in the Lyons case and made the following observation regarding it:

"That case, however, can not be reconciled with the great weight of authority. It should not stand as the law of this state. To construe the language there [in the will] employed as indicating an intent on the part of the testator to postpone the income of the life tenant is in effect to deny the general rule, as similar language will be found in most trusts. Of course, all authorities agree that the testator may fix another date than that of his death as the date from which the income shall accrue. But, upon reflection, it becomes plain that the language used in the Lyons case should

not have been so construed. Similar and even much stronger language used under more compelling circumstances has been construed as entitling the life tenant to the income from the time of the death of the testator, as reference to the following authorities will abundantly show:" citing many authorities.

■ The fact that the testator devised and bequeathed the residue of his estate to John C. Uglow as trustee, with direction to him to pay the income therefrom to designated beneficiaries, does not alter the general rule hereinabove stated that such income shall accrue to the beneficiaries as of the date of the testator's death, rather than the date of the delivery of his estate to the trustee: *In re Leitsch's Will*, supra, and authorities therein cited.

■ The sum which the plaintiffs now contend was not turned over by the executor to the trustee, variously referred to as $4,741.82, $4,645.75 and $4,631.80, was not, at the time the estate was delivered to the trustee, sufficient to pay the amounts which the will specified should be paid to or for the use of the beneficiaries, exclusive of the $50 monthly installment to the testator's widow. This is true, whether those amounts be computed on the basis of $25 a month each to all six beneficiaries or as one-sixth of the net income of the estate to those who had attained the age appointed to receive it, and $25 monthly to each of the remaining beneficiaries.

In his final report the executor properly segregated from the principal of the estate the income which he had received from the estate during probate. In this account he showed that he had on hand $17,741.82, of which $13,000 represented proceeds of sale of stocks and bonds belonging to the estate, and $4,741.82 was

income earned by the estate and subject to distribution to the beneficiaries. The order approving this final account recited that the sum of $4,741.82 on deposit in a bank "would at this time be subject to distribution to the devisees as provided in the last will and testament of Abel Uglow, deceased". The executor actually distributed a total of $4,631.80 to four of the beneficiaries.

This suit is against John C. Uglow as trustee, and the question of whether the income realized by the executor should have been divided by him as such executor among six beneficiaries rather than four can not be litigated in this proceeding. That was a matter within the province of the probate court. As trustee, John C. Uglow is not concerned with the income earned by the estate during probate and distributed by the executor prior to the time that the corpus of the trust estate was delivered to the trustee.

■ The widow, Margaret Uglow, at the time she filed in the probate proceedings her purported waiver of the right to take under the will apparently assumed that she had a right to have the residence where she and the decedent were living at the time of his death set aside to her as a homestead, and on such assumption procured the order of the probate court attempting to set that property aside to her as a homestead. Shortly after the entry of that order she conveyed her interest in such two-acre tract to her son, John C. Uglow, who resided on the property from shortly after his father's death until the date of the hearing of this case.

One of plaintiffs' objections to the trustee's report was based on the alleged ground that the two-acre tract attempted to be set aside by the court to the widow as a homestead was a part of the trust estate; that the

trustee had at all times occupied the premises under a claim of ownership; that the reasonable rental value thereof was $50 a month; and that at no time had the trustee accounted to the trust estate for any rental or other income from such real property.

The trial court ruled that under the law in effect at the time of the death of Abel Uglow (April 6, 1925) the order of the probate court attempting to set aside that property as a homestead was void. In so holding, the circuit court was correct: *Leet v. Barr*, 104 Or. 32, 202 P. 414, 206 P. 548; *Overland v. Jackson*, 128 Or. 455, 275 P. 21; and *Slattery v. Newell*, 115 Or. 22, 236 P. 268.

Prior to the enactment of §§ 5 and 6 of chapter 112, Laws 1919, codified as §§ 225 and 226, O. L., it had been held by this court in a number of cases that the surviving widow or widower was entitled to have the property occupied as a family residence set off as a homestead, and that the surviving spouse could not be deprived of that right by any testamentary disposition of the premises made by the decedent husband or wife. By the enactment of the 1919 law the former statutory right to have the homestead set aside was abrogated: see cases last above cited. And it was not until 1927 (chapter 345, Laws 1927) that such right was restored: §§ 3-205, 3-206 and 11-402, Oregon Code 1930; *Banfield v. Small*, 139 Or. 134, 8 P. (2d) 779; *Dunlap v. Woodruff*, 161 Or. 93, 87 P. (2d) 225.

■ The circuit court held that no part of the eighteen-acre tract known as the home place ever became a part of the trust estate. On this appeal the plaintiffs accept that ruling but now assert that the trial court erred in holding that the home place "vested in the heirs of Abel Uglow living at the date of the death of Margaret

Uglow, to wit, November 25, 1936'', instead of the date of the filing of Margaret Uglow's purported election not to take under the will.

Since it is no longer contended that this property is part of the trust estate, it is unnecessary for us to determine the question of whether Margaret Uglow did in legal effect renounce the benefits of the will, or whether the court erred as to the time when the heirs of Abel Uglow would be entitled to the possession and enjoyment of the home place. This suit was instituted against John C. Uglow as trustee, for an accounting by him as such trustee. The other three children and heirs of Abel Uglow were made defendants, but defaulted. They were not apprised, by the complaint filed against them, that any questions other than those pertaining to the trust estate would be attempted to be litigated in this proceeding. Any decision now made by this court on the two questions last above mentioned would not be binding upon the three heirs who have not appeared in this proceeding, and we do not believe that the ruling of the circuit court as to the time when the right to possession of the eighteen acres accrued to the heirs of Abel Uglow, deceased, should be regarded as binding even upon the plaintiffs in this case. That is a matter which should be determined in a proceeding in which all persons interested are made parties, and not in a suit involving the trust estate. The only manner in which the home place is actually involved in this suit is in connection with the expenditure of trust funds upon it. This matter was covered by the trial court's decreeing that the trustee ''should be charged with the amounts expended by him as trustee from the funds of the trust on'' the property attempted to be set aside to Margaret Uglow, and that the court

would retain jurisdiction "for the purpose of ascertaining and determining the amount of money expended by him from the trust fund on the property known as the 'home place' ".

■ The circuit court overruled the plaintiffs' objections 2 to 6, inclusive, to the trustee's claim of credit for disbursements for insurance, water, repairs, improvements, interest on improvements, and taxes, paid out of the trust funds and asserted by the trustee to have been expended in connection with the administration of the trust estate. The total of such disbursements is in excess of $14,000. The plaintiffs argue that the burden is on the trustee to prove by satisfactory evidence that the disbursements made by him were in fact made in the interest of the trust. They further contend that the trustee has failed to meet this requirement as to all the items above mentioned.

It is conceded by the trustee that the burden was on him to make out a *prima facie* case showing that the disbursements made by him were for the benefit of the trust estate. As part of his case he introduced tax receipts showing the amounts of taxes paid and the properties against which those taxes were levied, receipts issued by the Dallas water commission with description of the properties to which water was furnished, receipts of the city of Dallas for interest and amounts of principal on city improvement bond liens, receipts for insurance paid, canceled checks, his cash book and ledger and many receipts taken by him from individuals to whom payments out of the trust funds had been made. The annual reports of the trustee for the first six years of his administration of the trust were also introduced in evidence.

The trustee testified that the disbursements shown by the receipts and accounts were made by him in connection with the trust administration. During his cross-examination he admitted that he had paid $601.68 out of trust funds on special assessments against residential property owned by him individually, and that the amount so paid by him should be charged to him personally. A few other items were shown to have been paid by the trustee in connection with the home place, and the determination of the amounts thereof was left for the further consideration of the trial court.

The plaintiffs would have the court surcharge the trustee's account with the entire amount, in excess of $14,000, paid out of trust funds for taxes, water rents, insurance, repairs to buildings and improvement of properties, and claimed by the trustee to have been paid for the benefit of the trust estate, because on cross-examination it was shown that a small portion of this expenditure was in connection with property which did not belong to the trust. In those instances in which it appeared that the items were not properly chargeable to the estate, the circuit court refused to credit the trustee. The few errors so made by the trustee were due to carelessness rather than a wrong intention and were not such as to warrant the court to deny him credit for the balance of the money expended by him. The plaintiffs' objections 2 to 6, inclusive, are therefore not well taken.

■ In objecting to the trustee's account the plaintiffs argue that it should be surcharged with certain items of rental. Preliminarily to taking up those objections it is necessary to refer to another feature of this case, namely, the right, if any, of the widow to receive one-half of the net income from the real property.

The annual reports filed by the trustee indicate that from time to time he paid to Margaret Uglow, the widow, one-half of the net income from the real property of which Abel Uglow died seized. This continued up to the end of April, 1929, at which time he had paid to her a total of approximately $800. Thereafter and up to the first of 1936 the trustee paid to Mrs. Uglow additional sums totaling in excess of $500, but it is difficult to ascertain from the record on what basis these subsequent payments were made.

All the rentals which the plaintiffs assert that the trustee received and did not account for, as well as those rentals which he did not collect and with which they would have his account surcharged, accrued prior to the death of Margaret Uglow. Whether the beneficiaries under the trust would be entitled to have the trustee's account surcharged with the entire aggregate of the rentals collected and not accounted for and those rentals which he should have collected but did not, or only one-half thereof, would depend upon the widow's right to one-half of the net income from the real property involved. The question of whether the widow was entitled to one-half of the net income from the real property is not properly presented on this appeal and can not here be determined on the record before us. We therefore refrain from expressing an opinion on that matter.

The brief of the appellants states that Margaret Uglow was paid by the trustee $1,308.83, but there is nothing in the briefs before us or in the record, so far as we have been able to ascertain, to indicate upon what basis this amount was paid her, with the exception of what we have hereinbefore stated as to the reports filed by the trustee for the years 1928 and 1929. There-

fore, in surcharging the trustee's accounts with rentals from various tenants for certain periods the entire amount of such rentals, rather than one-half thereof, will be charged to him, and any adjustment to be made between the beneficiaries and the trustee will be left to the circuit court to determine in appropriate proceedings.

Objections 24, 25, 27 and 29 are directed to the alleged failure of the trustee to account for rentals which, according to his testimony, he received from four of the tenants of trust properties.

The plaintiffs list the items of rental which the trustee testified he had received from the Savery drug store and which they assert he did not account for, as the following: 1930, March, $65; 1932, July, $65; 1933, March and December, $120; 1934, May, $55; total, $305.

The March, 1930, rental was not paid during the month it accrued, but the trustee's account shows that in May of the following year an extra payment of $65 was made, to cover it. The rental for July, 1932, although not paid during that month, was paid in August of that year, according to the trustee's account. For 1933 the trustee accounts for $660 received as rental from the Savery drug store. He testified that during 1933 he reduced the rental from $65 to $55 a month, which at the latter rate would total $660 for the year. His account, however, shows that the drug store paid $65 for each of the months of January, February, April and June of that year, and $130 in both July and September, clearly indicating that the rental remained at $65 per month until at least October, 1933, and that the trustee has failed to account for one month's rental for the first nine months of that year. For December, 1933, the trustee's account shows $140 received, apparently to apply on the rental for October, November

and December. This amount, however, is $25 less than the entire rental due for those months at the rate of $55 per month, which makes a total of $90 rental received from that tenant and not accounted for as of the year 1933. The trustee admits in his brief that he received the rental of $55 for May, 1934, and should be held accountable for it. This brings to $145 the total amount of rental from the Savery drug store with which the trustee's account should be surcharged.

The trustee has failed to account for rental which he received from the Dallas chamber of commerce for the months of September and November, 1931, at the rate of $17.50 per month, a total of $35. He asserts that some time later he reduced the rent from $17.50 to $10 a month and was of the opinion that this reduction applied to past months for which rental at the rate of $17.50 per month had been received and accounted for by him. The account of the trustee shows that the chamber of commerce paid rental at the rate of $17.50 per month until December, 1932. Therefore, it is unreasonable to explain the deficiency for September and November, 1931, by applying to those months the reduced rate of rental that was not effective until at least December of the following year. The trustee should be charged with $35 as rental collected from the chamber of commerce and not accounted for by him.

His account should also be surcharged with $15 collected by him from another tenant, H. L. McMurphy, as rental for September, 1930. According to the trustee's testimony, he cashed rental checks on many occasions and applied the proceeds to his personal use, with the intention of charging his own account with the money so used. He admits that he may have over-

looked charging his account in some instances. His testimony in connection with this particular account was as follows:

"Q. Just when did you charge this fifteen dollars to yourself, if you happen to remember it, was it near the time you received it?

"A. No, it was quite some time later; I did when I discovered it."

He was unable, however, to point to any record showing entry of this amount as a charge against him.

The Rex cafe for many years occupied premises belonging to the trust estate. At first it paid a rental of $40 a month, which later was reduced to $35, then $25, and finally to $15 a month. The present tenant pays $20 a month. The cafe has changed hands and been operated by various owners during the period of the trusteeship. At intervals it has been closed and no rent charged it.

The plaintiffs assert that the testimony of the trustee is to the effect that he collected from the proprietors of this cafe $375 for which he did not account. One of the items making up this total is rental for May, 1928. The report of the trustee accounts for $440 for the year 1928, which amount covers the entire rental at the rate of $40 a month due for the eleven months of that year during which he was in possession of the property as trustee.

The trustee's report fails to show that any rentals were collected by him on this property for the months of January, February and March, 1931. For many months prior to that period, and thereafter up to and including July of that year rentals at $40 a month are reported. The only record introduced by the trustee with reference to the renting of the Rex cafe is that

shown in the cash books as rental actually paid. As to other tenancies the trustee kept separate ledger accounts showing rents due and those paid. He testified that the tenant in the cafe premises at the time he became trustee paid his rent regularly until his death, and thereafter his widow attempted to operate the business, but unsuccessfully. Then followed a number of different tenants, some of whom paid their rent and others did not pay anything. No attempt is made to fix the dates of these various tenancies. It would appear, however, from the fact that rentals of $40 a month had been paid for a considerable period prior to January, 1931, and subsequent to March of that year, and from the inference to be drawn from other facts in the record, that the premises were occupied during those months and that the trustee either collected the rent for the first three months of 1931 and did not account for the same or that he has not shown sufficient reason for not collecting such rentals. The same is true of the rental of $35 for January, 1932. His account, therefore, should be surcharged with $155 with reference to the Rex cafe.

For January to June, inclusive, 1933, no rental whatever for these premises is accounted for by the trustee. Prior to that time a rental of $25 a month had been paid, and beginning in July of that year $15 a month was charged for the premises. We believe that the evidence, although meager, is sufficient to sustain the contention of the trustee that during that period either the property was vacant or the rent uncollectible. This also may be true as to the rentals for January and February, 1934.

■ We now proceed to the consideration of certain rentals which the trustee admits are due to the estate

but which he has not collected. In approaching this branch of the case it must be borne in mind that the trustee is *prima facie* accountable for all the rents of all the properties during the whole period of his trusteeship, and that he can not be relieved of liability therefor except by proof that he did not collect rents and that he was unable to collect them through the exercise of due diligence.

The plaintiffs list as rentals due the trustee and uncollected by him the following: Dr. P. T. Carnes, $155; Dr. E. C. McCallom, $1,500 ($1,150); Dr. A. B. Starbuck, $1,400; Dalton Electric Co., $102.86; Adolph Electric Co., $80; J. R. Craven, $1,039.98.

■ Dr. Carnes was a chiropractor and occupied space upstairs in the Uglow building from September 5, 1930, to February 5, 1933. His entire rental for that period was $435, all of which except $155 was paid at the time of his removal from Dallas in 1933. He paid in full each month the rental due for the months of his occupancy in 1930 and the entire year 1931. His practice was very limited and he had difficulty in collecting fees due him. In order to assist as far as possible in the payment of rent he turned over to the trustee some of his own accounts receivable, and some of those accounts were collected by the trustee and applied on rental due from this tenant. We are of the opinion that the trustee did use due diligence in attempting to collect rentals from this tenant.

■ Mr. Dalton occupied one of the store rooms, into which he moved during September, 1933. That property had been vacant for some time and he was allowed, according to the trustee's testimony, three months' free rental in order to assist him in establishing his business. The entire rental charged against him was $175, of

which he paid approximately $72. His venture did not prove profitable and he was obliged to abandon his business. What little stock he had was sold to Mr. Adolph, who moved into the premises and has since conducted the business under the name of Adolph Electric Co. The total amount of rental payable by Adolph Electric Co. was $200, of which $80 remained unpaid. It would appear from the record that the trustee was acting for the best interest of the estate in attempting to fill a vacancy of long duration. He should not be held accountable for the balance of rental due from Dalton Electric Co. or that due from Adolph Electric Co. It is apparent that Mr. Adolph has done all that could reasonably be expected from him in paying past rentals, and in all probability what is now owing from him will be paid in the near future.

Dr. McCallom was occupying his present offices prior to the time that Mr. Uglow as trustee took over the administration of the estate. The rental payable by him during all the period of his tenancy has been $17.50 per month. The first record that we have of Dr. McCallom's occupancy is as of May, 1927. It is shown by the books kept by the trustee that no rental was paid by Dr. McCallom during that year. Likewise, he paid no rental in 1928 except $100 on November 16. During the years 1929 and 1930 no rental was paid by this tenant. In 1931 one payment of $150 by him on January 12 is recorded. For 1932 there was a balance of $100 due from him for rent; for 1933, $65; and for 1934, $62.50. From the evidence introduced by the trustee we are led to believe that the total rental due from Dr. McCallom for the period under consideration by the circuit court was $1,802.50, of which amount the tenant paid $652.50, which would leave a balance of

$1,150 due from him, rather than the $1,500 stated in the briefs. Some time before the hearing Dr. McCallom gave the trustee a note for $909.50, which was the balance then due from him for rent. This note was payable at the rate of $42.50 per month, and a few payments on it were made. Dr. McCallom, however, did not pay the entire amount of rentals as they accrued after he gave that note.

Dr. Starbuck has occupied office space in the Uglow building ever since the trustee began his duties. His stipulated rental is $25 a month. During the year 1928, from February to December, inclusive, Dr. Starbuck paid no rent. During 1929 he paid $100 on account of rentals. In 1930 and 1931 he paid no rent. For 1932, 1933 and 1934, respectively, he owes balances of $55, $160 and $90. Dr. Starbuck paid $315 as rental during 1935, which was $15 in excess of the total amount accruing during that year.

The accounting of the trustee does not cover any period of time subsequent to 1935, and therefore we have no way of ascertaining what may have been paid by the various tenants since that time. The trustee testified that Dr. Starbuck had a good practice and owned a valuable prune orchard, also that Dr. McCallom owned an interest in a brick building at Dallas. The plea of the trustee that the depression retarded rental collection does not excuse him for the laxity with which he treated these two accounts. The depression certainly could have had no effect on the payment of rentals prior to the autumn of 1929. According to his own testimony, the trustee has not attempted to obtain security for these past-due accounts. He has not exhibited proper diligence in attempting to collect rents from these tenants, such as required of a trustee.

We are of the opinion that he should be charged with the full amount of the rental balances owed by Dr. McCallom and Dr. Starbuck and not collected by him.

16. The statement of accounts receivable above quoted from plaintiffs' brief indicates that Mr. Craven was in arrears in rental in the sum of $1,039.98. The trustee's ledger contains a statement to the effect that the rent from May, 1929, to December 31, 1932, was $50 a month, and thereafter $25. From the transcript of testimony it appears that the total rental due from this tenant for May, 1929, to December 31, 1935, amounted to $2,500, of which he paid only $1,169.69, leaving a balance of $1,331.31 unpaid.

Mr. Craven conducts a paint and hardware store. He commenced business in May, 1929, and during the remainder of that year he paid as rental $250.98 in cash and merchandise. During the next year the total amount of rental paid by him was $300, and for 1931 he paid in cash and merchandise $270.02. Since 1935, as we understand the record, Mr. Craven has been paying the rentals as they accrued. This tenant is now and for some time past has been employed as recorder of the city of Dallas, and his family is assisting him in conducting the store. His business seems to be improving and he is confident that the balance of rental he owes will be paid. The trustee is of the same opinion. Had the trustee not been lenient with him, Mr. Craven, according to his own testimony, would have been unable to continue in business. The store might then have been vacant for a considerable period. We do not believe that we should be justified, on the record before us, in ruling that the trustee's account should be surcharged with the balance of rental due from Mr. Craven.

■ Mr. J. C. Tracy had for a period of twenty years preceding the trial occupied one of the dwelling houses belonging to the trust estate. The house was built some ten years prior to the inception of Mr. Tracy's tenancy. During the administration of the decedent's estate by the executor it became necessary to make additions and repairs to this house in order to keep it in rentable condition, and at the instance of the executor Mr. Tracy expended the sum of $1,493.77 in labor and materials in making the necessary alterations and repairs, under an agreement with the executor that this amount should be offset against future rentals at the rate of $25 a month. This credit was given to Mr. Tracy by the executor on March 10, 1926. The evidence is undisputed that the amount for which Mr. Tracy was given credit represents the reasonable value of the alterations and repairs made by him, and that $25 a month is a reasonable rental for the property following its improvement.

The plaintiffs compute the rental due for this property at $25 a month from February 1, 1928, to March 1, 1936, as $2,425. Against this, they refer to the total amount of rent paid in cash by the tenant as $1,806, leaving a difference of $619. This latter amount the plaintiffs would have the court charge to the trustee. The ground they assign for so doing is that the executor had no legal right to create a future liability against the estate in his hands, and that the trustee should not have recognized the agreement between the executor and Mr. Tracy as binding upon the trust estate.

While the court can not look with favor upon the action of the executor in making the arrangement which he did with one of the tenants of estate property, nevertheless it would not be equitable to allow the bene-

ficiaries of the trust estate to profit from the increased rental value of the house improved and occupied by Mr. Tracy and charge against the trustee's account a considerable portion of the cost of such improvement. The trust estate has in no wise been injured by this bargain with a tenant.

Had the executor failed to permit the improvements to be made during his administration of the decedent's estate, this property might have been vacant for some time, or at least the rental paid by Mr. Tracy would have been reduced. If the improvements had not been made during the executor's administration, they would undoubtedly have had to be made by the trustee. The plaintiffs' objection to this item of the trustee's account was properly overruled by the circuit court.

■ Instead of making his cash payments monthly, Mr. Tracy paid rental for a year or more at a time. It appears that he was engaged in the prune business and received most of his annual income at approximately the same time of each year, at which time he would pay the trustee a sum of money covering rent for many months past. The plaintiffs complain because the trustee failed to collect rent from Mr. Tracy each month, and ask that the trustee's account be charged with interest on the deferred payments.

The failure of the trustee to collect rentals monthly from Mr. Tracy may have constituted negligence, but not necessarily. It frequently happens that indulgence to the debtor is a matter of prudence on the part of the creditor. This court does not find that in permitting this tenant to pay rentals as he did, rather than from month to month as they accrued, the trustee failed to exercise reasonable judgment. As was said in *In re*

*Schandoney's Estate*, 133 Cal. 387, 65 P. 877, quoting from an earlier California case:

"Trustees act for the benefit of others, and not for themselves, and the fair exercise of their judgment should be a protection to them. Supine negligence or wilful default will render them liable; but, to make them liable for mere errors of judgment, would tend to discourage good and prudent men from taking any trusts."

■ It has hereinbefore been pointed out that the inventory of assets of the trust estate filed by the trustee February 1, 1928, showed that the trustee had cash in the bank amounting to $13,463.42, bonds of Morgan-Bushong Investment Company of the par value of $3,500, bonds of Willamette Southern Railway Company of the par value of $9,000, and 250 shares of the common stock of Tillamook Timber Company of the par value of $100 per share. This made a total of $50,963.42 in cash, bonds and stocks at their respective par values.

On October 16, 1928, the trustee filed with the clerk of the circuit court for Polk county a petition in which he recited that he had on hand the sum of cash above mentioned, subject to investment; that he had made "an investigation of different investments and finds that the 'Oregon Industrial Loan Company' of Portland, Oregon, seems a safe, conservative company paying seven per cent preferred on its stock and the company has been recommended as a very safe investment; that your petitioner has visited the office of the state corporation commissioner and finds the affairs of said company in a very safe and satisfactory condition"; and that in the petitioner's judgment a purchase of stock in that company would be a safe and proper investment for at least a part of the funds on hand. The petition then requests that the court make an order

"authorizing and directing" the trustee to invest the sum of $10,000 in the stock of that company. On the same day, the circuit court for Polk county entered an order reciting the facts stated in the petition and authorizing the trustee to invest $10,000 of trust funds in the stock of Oregon Industrial Loan Company.

It will be observed that in his petition the trustee asks for permission to purchase stock, not indicating whether he proposes to buy preferred or common stock. The order of the court merely granted permission to him to purchase stock, without specifying the classification.

On October 1, 1928, Mr. Uglow had signed an order with Oregon Industrial Loan Company to purchase 750 shares of its seven per cent preferred stock at a price of $7,500, and 250 shares of its common stock of no par value for $2,500. Two weeks later, on October 15, which was the day before he filed his petition for permission to purchase the stock, he gave his check as trustee to Nelson E. Frost, in payment for those shares of stock. Frost deposited the check in a bank for collection that same day.

Later, on October 22 of the same year, the trustee filed another petition in the circuit court, in which he represented that he had $3,000 belonging to the trust estate subject to investment, and that after making diligent search he had found that he could purchase at that time $3,000 worth, "being sixty shares of the par value of $50 each of 'Mortgage and Loan Company of Oregon,' the same being preferred stock and bearing interest at the rate of seven per cent per annum". The petition further recites that the trustee had made diligent investigation regarding this company and had talked with the corporation commissioner, and closes

with a request for permission to purchase $3,000 worth of stock in that company. The circuit court gave its permission by order dated the day the petition was filed.

The plaintiffs assert that the trustee in purchasing the stock of Oregon Industrial Loan Company and Mortgage and Loan Company of Oregon violated the provisions of the will of Abel Uglow, deceased, whereby the trust was created, and that the orders of the circuit court, inasmuch as they were entered on the *ex parte* application of the trustee, did not afford him any protection.

It is the plaintiffs' contention that under the provisions of the will it was the duty of the trustee to invest the trust funds "in some safe, interest-bearing security, approved by the court". They call attention to the last part of paragraph XIII of the will. The first part of this paragraph provides that if the income from the decedent's estate at the time of his death is not sufficient to pay $25 a month to each of the beneficiaries during a certain period, then each of them shall be paid a proportionate part of the income. It is then provided that "in case it [the income] shall be sufficient to more than pay such bequests in full, the overplus shall be added to the principal and reinvested in some safe, interest-bearing security, approved by the court having jurisdiction hereof". In no other place in the will is any direction given as to the manner in which the funds of the trust estate shall be invested. The trustee, on the other hand, argues that this provision of the will last hereinabove quoted refers only to the investment of surplus income and does not in any way concern the investment of funds comprising the principal of the trust estate.

Construing the will as a whole and having in mind the intention of the testator in establishing the trust, it is our opinion that the testator did expressly direct that not only the surplus income but the principal of the trust estate should be invested by the trustee in safe, interest-bearing securities. The purpose of the testator was to provide a definite monthly income for his widow, his children and one grandchild until those descendants respectively should reach certain ages specified in the will, at which times the children and grandchild should each receive one-sixth of the net income of his estate. None of these beneficiaries is to receive any part of the corpus of the estate. In order to provide the amount of income contemplated by the testator it would be necessary to keep the funds of his estate invested in securities reasonably certain of yielding a continuing return.

The testator was more concerned about providing this income for his heirs then living than building up a larger estate for their heirs. He therefore provided in the last part of paragraph XIII of his will that the surplus income should "be added to the principal and reinvested in some safe, interest-bearing security". The testator did not intend, in wording the will as he did, that only the surplus income should be thus invested; but, as stated, such surplus income should become a part of the principal, which principal was to be invested as directed.

In the order of the county court approving the final account of John C. Uglow, executor, it is recited that sums of money aggregating $13,000 had been realized by the executor from the sale of certain stocks and bonds belonging to the decedent's estate and "would not be subject under the terms of the will of the said

Abel Uglow to distribution at this time, but would be reinvested in some approved sureties, bonds or other interest-bearing securities". This order of the county court, prepared by the attorney for the executor, was in accord with the obvious intention of the testator.

With reference to investments by trustees under the direction of the court, we quote the following from 65 C. J., "Trusts", § 689:

"If a trustee is at a loss as to the mode of investment, or if the condition of the parties or of the estate may seem to require a particular mode of investment, it is at once the duty and the privilege of the trustee to seek the instruction of the court, and thereby insure its protection. However, while the approval of the court, if asked for in advance, will effectually protect the trustee in case of subsequent loss, it by no means follows that the failure to apply to the court is in itself sufficient to cause such liability. The only effect of such failure is to throw upon the trustee the burden of showing that the investment was such as the law permits, and that in the light of circumstances existing at the time it was made there was no imprudence in making it. It is the duty of a trustee to give the court all the information in his power, in order to enable it to give directions most suitable to the true nature of the case, and such as may be alike beneficial to all concerned. If he departs from the instructions thus sought and received, he acts on a responsibility which he must be prepared to vindicate. The court may direct any investment which in its judgment will best promote the interests of the cestui que trust, having in view both the security and the productiveness of the fund; and it may, in a proper case, direct the conversion of the fund from real estate into personal estate or vice versa. *This power is, of course, subject to the trust instrument and can not be exercised in conflict with any provision or direction of it, expressed or implied, without the consent of all the persons interested,*

except perhaps in cases of emergency where the court may have an extraordinary jurisdiction founded on necessity to go beyond the mere administration of a trust according to the terms of the instrument creating it; nor has the court power to require a trustee to invest the trust funds in property which it could not permit him to invest in of his own volition." (Italics supplied.)

■ The general rule is that when a trustee in good faith applies to the court having jurisdiction over the trust for instruction as to the making of investments within the contemplation of the trust instrument, and in so doing makes full disclosure of all pertinent facts within his knowledge, acquired after a reasonably diligent investigation, he will be protected against liability in following the advice of the court. To give a practical illustration of this rule: Had the trustee in the instant case been in doubt as to which of several permissible interest-bearing securities he should purchase and had he, after making proper investigation, in good faith sought and followed the advice of the court in regard thereto, he would not be held liable if the securities purchased on such advice should prove to be an unwise investment.

In the instant case there was no application made to the circuit court for a construction of the will. Nor did the trustee seek an order of that court permitting him to make investments other than those specified in the will on the ground that it was impracticable to comply with the will or that it would be more beneficial to the *cestuis que trustent* to invest the funds otherwise than as directed by the trust instrument. Furthermore, the orders approving the investments were made without notice to the beneficiaries.

■ Shares of stock in a corporation are not interest-bearing securities: *Williams v. Cobb,* 219 Fed. 663; *In re Morris's Estate,* 276 N. Y. S. 254; *Woodruff v. Ward,* 35 N. J. Eq. 467; *Gilbert v. Welsch, Administrator,* 75 Ind. 557; *In re Trusteeship of Couden,* 9 Ohio App. 207. The court had no authority, therefore, on the petition presented to it by the trustee, to permit the trustee to make the purchase of stock to which attention has been called: 65 C. J., "Trusts", § 689; *International Trust Company v. Preston,* 24 Wyo. 163, 156 P. 1128; *Hackett's Executors v. Hackett's Devisees,* 180 Ky. 406, 202 S. W. 864; *Stephens v. Collison,* 274 Ill. 389, 113 N. E. 691, Ann. Cas. 1918D, 559. In this state the purchase of corporate stock such as here involved is not considered a safe investment of trust funds: *Marshall v. Frazier,* 159 Or. 491, 80 P. (2d) 42, 81 P. (2d) 132, and authorities therein cited.

■ In addition to the $10,000 invested in October, 1928, as above mentioned, and the $3,000 invested later during the same month in stock of Mortgage and Loan Company of Oregon, the trustee purchased twenty shares of preferred stock of this latter company October 31, 1929, for $1,000. He received on December 4, 1928, $45 on the common stock of Oregon Industrial Loan Company and during the year 1930 received $649.60 as dividends paid by the same company, whether on preferred or common stock the ledger does not disclose. From Mortgage and Loan Company of Oregon during the years 1929 and 1930 the trustee received small amounts as dividends on stock. On or about December 18, 1930, both these companies became insolvent and receivers were appointed for them. The stock in both companies, as stated by the trustee,

was of no value at the time of the trial and nothing had been obtained on it from the receiverships.

The trustee's account should be surcharged with the $14,000 paid by him for stock of these two corporations, with interest thereon from the respective dates of purchase, less whatever he has received as returns on such stock and placed in the trust fund. The rate of interest will hereinafter be stated.

■ In October, 1930, the trustee sold bonds of Willamette Southern Railway Company of the par value of $10,000 for $9,405, and at approximately the same time purchased 1,150 shares of North American Trust for $9,343.75. The sale of these bonds and the purchase of the trust shares were authorized by the circuit court on the *ex parte* application of the trustee. In March, 1935, the North American Trust shares were exchanged by the trustee, again pursuant to an order of the circuit court, for 120 shares of Massachusetts Investors Trust of an estimated value of $2,356.08. Such shares of stock are not interest-bearing securities within the contemplation of the trust instrument before us. As pointed out in *Marshall v. Frazier*, supra, the purchase of such stock is not a proper investment of trust funds, even though the trust instrument does not provide the manner in which the trust funds are to be invested. What was there said concerning this class of investment is equally applicable to the facts in the instant case. It follows that the trustee's account should also be surcharged with $9,343.75, together with interest thereon from the date of payment, less any amounts received as dividends on North American Trust shares or the shares for which those were exchanged. Upon the pay-

ment of this amount the trustee will become, of course, the owner of the shares.

■ Upon petition of the trustee the circuit court on December 21, 1929, authorized the trustee to purchase the following bonds at the prices indicated:

| | |
|---|---:|
| 3 $1,000 6% first mortgage bonds of Mortgage and Loan Company "(of Portland)" | $3,000 |
| 2 $1,000 7% first mortgage bonds of Clear Creek Creamery Company | 2,000 |
| 1 $500 7% first mortgage bond of Clear Creek Creamery Company | 500 |
| 1 $1,000 6% Multnomah Club bond | 1,000 |
| 2 $1,000 Pittock Block bonds | 2,000 |
| Total | $8,500 |

All these bonds listed were bought in accordance with the order above mentioned, with the exception that the trustee purchased two $1,000 Multnomah Club bonds and only one Pittock Block bond. They all are secured by first mortgages. It is our opinion that they come within the provisions of the will creating the trust and that the trustee acted in good faith in purchasing them.

■ The funds with which the above bonds were purchased apparently comprised part of a dividend payment received by the trustee in July, 1929, on the stock of Tillamook Timber Company. The total payment was $9,750. For a considerable period of time before his death Abel Uglow owned 250 shares of stock of Tillamook Timber Company. One of the alleged instances of negligence charged against the trustee is that he had not disposed of this stock and invested the proceeds therefrom in interest-bearing securities. The record discloses that the trustee did all that he could to sell this stock and that there was

no market for it. We find that the trustee was not negligent in this regard.

The report of the trustee covers a period from February 1, 1928, to January 1, 1936. During that time he disbursed to the beneficiaries under the will, including Margaret Uglow, the widow, the following amounts:

| | |
|---|---|
| Charlotte Vaughn Kinney | $1,225.00 |
| Wendal A. Sanders | 1,445.00 |
| Pearl Turner | 317.37 |
| Alice Wood | 537.37 |
| Mary McDonald | 307.37 |
| John C. Uglow | 207.37 |
| Margaret Uglow | 1,308.83 |
| Total, | $5,348.31 |

The plaintiffs object to these disbursements on the ground that they were not made in accordance with the provisions of the will with reference to the trust. It has already been pointed out that it is not clear from the record on what basis Margaret Uglow was paid the $1,308.83 mentioned.

It is likewise impossible to ascertain the basis on which the trustee apportioned the disbursements he made to the six descendants of the testator. He stated that Wendal Sanders was in need of money and therefore was given the largest amount. The trustee seems to have believed that those who had not reached the age at which they were to receive one-sixth of the net income were to be paid $25 a month before the other beneficiaries were entitled to their respective sixths of the net income. This is not the construction which we place on the will. In no event was any one of the heirs to receive more than one-sixth of the net income, either before or after reaching the age specified for receiving one-sixth of such income. When the net income was

insufficient to pay to each of the heirs not to exceed $25 a month, all were entitled to equal proportions of the amount of money available.

A proper adjustment should be made in order to equalize disbursements to these six heirs, and by this we mean disbursements made by the trustee out of income of the trust estate. We are not here concerned with payments made by the executor.

On July 3, 1929, the circuit court entered an order finding that $100 was a reasonable fee to be allowed the trustee, and that his salary be "until further order of the court hereby fixed at the sum of $100". It may be assumed that the salary named was the monthly compensation of the trustee. During the seven years and eleven months covered by his report he paid himself as for services $9,898.22. The circuit court reduced the amount allowed him to $9,500, representing salary at the rate of $100 a month for that period.

In 4 Bogert on Trusts and Trustees, page 2866, § 976, it is said:

"In the absence of a controlling statute, compensation may be awarded by the court at any time during the trust administration, but it is almost universally granted on an intermediate or final accounting and is allotted for the work done since the date of the last prior payment."

It was not proper for the circuit court to fix the salary of the trustee before any appreciable amount of work had been performed by him or there had been any fair indication of the nature and value of his services. While we do not feel justified in disturbing the trustee's salary at the rate of $100 a month up to and including the date of the order, after that date the amount of salary to be allowed him is $50 a month, which we consider ample compensation. Almost all

the work that the trustee performed since July, 1929, was that of looking after the real property of the estate, and he did not discharge that duty in a creditable manner. The trustee's account should be surcharged with the amount which he paid himself as salary in excess of the sum due at the rate herein fixed. He is not to be charged interest on the overpayment.

■■ The rate of interest which the trustee is to pay on amounts of money surcharged to him and required to bear interest is fixed at four per cent per annum. We have already pointed out that the interest on improvident investments made by him and surcharged to his account should begin as of the respective dates of his making such investments. Interest is to be paid by him on the uncollected rentals and those which he collected and did not account for, as above specified, beginning January 1 of the respective years following the accrual of such rentals.

It was the opinion of the circuit court that a co-trustee should be appointed to assist Mr. Uglow in the management of the trust estate. It is our view that Mr. Uglow should be removed from all connection with the trust administration, and a new trustee appointed by the circuit court. There are many reasons, not necessary for us to mention, in addition to those which appear in the foregoing discussion, calling for his removal.

■ The circuit court allowed the plaintiffs the sum of $500 as attorneys' fees for services performed in the institution and trial of this suit. The plaintiffs, however, assign as error the failure of that court to allow them the full $4,000 asked in their complaint. As to allowance of attorneys' fees, we quote the following from 107 A. L. R. 750, annotation:

"The later cases support the general rule stated in the original annotation, that it is proper for a court exercising equitable jurisdiction to make an allowance of a reasonable fee out of the fund or property created or preserved, for an attorney representing a party who, at his own expense, has maintained a suit for the recovery, preservation, protection, or increase of a common fund or common property, or has created or brought into court a fund in which others are entitled to share."

See also, *Ford v. Gilbert*, 44 Or. 259, 75 P. 138.

This suit now before us on appeal was instituted by the plaintiffs not only for themselves but for the other beneficiaries under the trust. The three heirs of Abel Uglow who defaulted will be as much benefited as the plaintiffs by the result of the litigation.

The trustee does not question the right of the circuit court to allow attorneys' fees in a case of this kind, but insists that the plaintiffs are not entitled to such allowance except to the extent that the work of the attorneys has benefited the trust estate. In view of the work performed and the results accomplished, the plaintiffs should be allowed the sum of $2,000 as attorneys' fees, to be paid out of the funds of the trust estate. This amount includes the $500 heretofore allowed as such attorneys' fees.

The decree appealed from is modified in the respects hereinabove set forth and the cause is remanded to the circuit court for further proceedings not inconsistent with this opinion. The appellants are entitled to their costs in this court.

RAND, C. J., and KELLY and LUSK, JJ., concur.

BEAN, J., not participating in this decision.

ROSSMAN and BELT, JJ., not sitting.