Argued May 8, reversed and remanded November 18, submitted
on petition for clarification December 8, 1970, remanded on
petition for clarification January 19, 1971

CROSS OF MALTA BUILDING CORPORATION,
*Appellant, v.* STRAUB ET AL, *Respondents.*

476 P2d 921
479 P2d 505

William G. Paulus and Fred H. Paulus, Salem, argued the cause for appellant. With them on the briefs were Paulus & Callaghan, Salem.

Peter S. Herman, Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Lee Johnson, Attorney General, and Jacob Tanzer, Solicitor General, Salem.

Before McALLISTER, Presiding Justice, and SLOAN,[*] O'CONNELL, DENECKE, HOLMAN, TONGUE and HOWELL, Justices.

O'CONNELL, C. J.

This is a suit by an Oregon property owner and taxpayer for a declaratory judgment and injunctive relief challenging the constitutionality of ORS 407.183 and 407.186. These statutes provide for the transfer of part of the money in the Oregon War Veterans' Bond Sinking Fund to the State General Fund. From a decree in favor of the defendants, the plaintiff appeals.

On November 4, 1944, the people adopted Article XI-A of the Oregon Constitution, authorizing the state to sell bonds and use the proceeds to make farm and home loans to qualified veterans. Section 1 of Article XI-A creates the Oregon War Veterans' Fund from which loans to veterans are authorized to be made.

---

[*] Sloan, J., resigned September 30, 1970.

Section 2 of Article XI-A authorizes the issuance of bonds for the purpose of creating a fund to be known as the "Oregon War Veterans' Fund."[1] Article XI-A is implemented by ORS 407.160 which provides that the proceeds from the sale of the bonds shall be deposited in the Oregon War Veterans' Fund. The statute authorizes the temporary investment of the bond proceeds prior to the time the money is loaned to the veterans.

Concurrently, the legislature, by ORS 407.170, created the Oregon War Veterans' Bond Sinking Fund to operate as a receptacle for (1) payments of principal and interest by veterans on their mortgages, (2) proceeds of refunding bonds, and (3) proceeds of tax levies under ORS 407.210. Earnings from the temporary investment of bond proceeds deposited in the veterans' fund were also credited to the sinking fund until Oregon Laws 1967 (Special Session) ch 19, § 2 went into effect.[2]

That legislation provided for the transfer to the General Fund of the state of Oregon a portion of the net earnings in the sinking fund. The "surplus" to be transferred was to be the excess of the net earnings of the veterans' fund and the sinking fund over 3% of the balance of the outstanding mortgage loans and contracts receivable on that date together with any like transfers previously made. (The 3% figure rep-

---

[1] "Section 2. Bonds. Bonds of the state of Oregon containing a direct promise on behalf of the state to pay the face value thereof, with the interest therein provided for, may be issued to an amount authorized by section 1 hereof for the purpose of creating said 'Oregon War Veterans' Fund.' Said bonds shall be a direct obligation of the state and shall be in such form and shall run for such periods of time and bear such rates of interest as provided by statute."

[2] ORS 407.140 (1965-1966 Replaced Chapters Volume).

resents the amount deemed necessary for the veterans department to meet bond principal and interest payments as they accrue.)

As of June 30, 1968, the veterans loan program had realized net earnings from its operations of $24,396,353.43. The earnings developed principally from two sources: (1) $9,690,176.19 was realized on investments of moneys in the sinking fund and in the veterans' fund; and (2) the remainder was derived from the difference between the interest income of 4% earned on the veterans' mortgages and the total of interest expense paid on the bonds and administrative expenses.[9] Under the legislature's formula, approximately $13.6 million would be transferred from the sinking fund to the general fund.

The Acts in question became effective February 20, 1968, and required a transfer from the sinking fund to be made not later than August 15, 1968. As of August 1, 1968, there was not enough cash in the sinking fund to make the contemplated transfer, large sums having been previously transferred into the veterans' fund for loans. Repayments were not mandatory, and the veterans' fund had not repaid much of what had been transferred. Sinking fund cash receipts in excess of operating expenses during 1968 were transferred to the veterans' fund. To accumulate the funds necessary for the transfer to the general fund, the Director of Veterans' Affairs sold $25 million in bonds on July 15, 1968.

On November 26, 1968, the trial court's decree in favor of the defendants was entered. Subsequently, the veterans' fund transferred about $13.6 million to

---

[9] The interest expense paid on all bonds averaged 3.37 per cent. There was in addition a small overhead expense of the Director's office.

the sinking fund to effectuate the transfer required by the statutes in question.

Plaintiff alleges that the sinking fund is comprised of constitutionally dedicated moneys and that any legislative act designed to divert such funds to a use other than that intended by the constitution is invalid.

It should be noted at the outset that the creation of the Oregon War Veterans' Bond Sinking Fund authorized by ORS 407.170 and the transfer of money in and out of that fund is of no significance in determining whether the so-called surplus funds in question were transferable to the general fund or were a part of the constitutionally dedicated Oregon War Veterans' Fund. The sinking fund is simply a bookkeeping device designed to make more convenient the handling of the money in the administration of the veterans' loan program. Therefore, whether the net earnings of approximately $24,000,000 are regarded as earnings traceable to money held in the sinking fund or money held in the veterans' fund is of no significance.

The important question is whether the net earnings are to be regarded as an increment inseparable from the dedicated fund and therefore available only for the making of veterans' loans.

The starting point in the analysis of this problem is the principle laid down in *State ex rel Sprague v. Straub*, 240 Or 272, 400 P2d 229, 401 P2d 29 (1965). There we held that interest accruing to a dedicated fund (in that case the State Board of Higher Education Fund), adheres to that fund. That same principle applies to the interest accruing to the fund in the present case.

It is conceded by defendants that the interest earned from the temporary investment of the proceeds of the bonds, prior to the loan of the proceeds to the veterans, is a part of the dedicated fund and is not appropriable by the state for its general purposes. When the proceeds of the bonds are finally loaned to the veterans there is, in effect, simply a change in the form of the investment and so viewed the interest received by the veterans' fund would also become a part of the dedicated fund.

Defendants argue that although the proceeds of the bonds are constitutionally dedicated, the amounts repaid by the veterans are not. This conclusion is reached apparently upon the reasoning that although the constitution requires that the *proceeds of the bonds* are to be used for veterans' loans and therefore at that stage the fund and its earnings are dedicated, there is nothing in the constitution expressly requiring the *proceeds arising from the repayment of loans* also are to be used for veterans' loans and therefore the legislature is free to use the repayment proceeds as it pleases.

■ If the proceeds arising from the payment of loans can be used for other purposes, it is necessary to assume that the people, in adopting Article XI-A, conceived that the bonds would be paid by the levy of taxes. We do not think that the veterans' loan program was so conceived. It appears to us that the program was intended to have the same basic design as that employed in financing the building projects through the State Board of Higher Education Fund authorized by Article XI-F (1). That article authorized the pledging of the state's credit to construct buildings which were to be self-liquidating and self-supporting from revenues, gifts, grants or building fees. We held

that the interest earned by the accumulation of the funds from various sources could not be diverted into the general fund. Although Article XI-F (1) expressly provides that the revenues from the buildings be used in liquidating the bonds, we think that a similar intent can be found by implication under Article XI-A that the revenue from loans to veterans in the form of interest was intended to be used to liquidate the veterans' fund bonds. We do not think that the people, in adopting Article XI-A, intended to authorize the legislature to levy additional taxes to carry out the veterans' loan program.

The power to levy taxes was intended only as a guarantee to the bondholders that if there was a deficiency in the fund as a result of defaulting borrowers, then the deficiency could be made up by the levy of taxes. Otherwise the veterans' loan program was to be self-liquidating.

■ We have already observed that the earnings derived from the investment of the proceeds of the bonds pending the loan of these proceeds to the veterans becomes a part of the dedicated fund. This is the case even if the earnings on the invested proceeds exceed the amount necessary to pay the interest on the bonds. If, in the foregoing circumstances, the surplus earned becomes a part of the dedicated fund, we see no reason why the surplus earned by the investment veterans' loans should not also be regarded as adhering to and becoming a part of the dedicated fund.

It is not likely that the people, in adopting Article XI-A, thought of the possibility of a surplus accruing. It is probable that they assumed that the loan program would not operate at a profit—in other words, that the veterans would be required to pay no greater interest rate than was necessary to repay the

interest charge on the bonds and the other incidental administrative costs. If they had considered the possibility of a surplus, we think it is more likely than not that they would have intended the surplus to serve the same purpose as the fund out of which it arose.

The decree of the trial court is reversed and the cause is remanded with directions to reimburse the Oregon War Veterans' Fund.

**ON PETITION FOR CLARIFICATION OR SUPPLEMENTATION**

384

Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem, for defendants.

William G. Paulus, Paulus & Callaghan, and Fred H. Paulus, Salem, filed a brief for plaintiff.

O'CONNELL, C. J.

Defendants have asked us to clarify our opinion in this case by deciding the extent of the state's liability to pay interest on the moneys diverted to the General Fund from the Oregon War Veterans' Fund. The issue of defendants' liability for interest was not litigated in the trial of the cause. However, the complaint did contain a prayer "that plaintiff be granted such other and further relief as may be equitable and proper."

■ In an equity case a prayer of this nature is sufficient to embrace a claim for interest where, under all the circumstances of the case, it seems equitable to do so. *Emrich v. Emery*, 216 Or 88, 99, 332 P2d 1045, 335 P2d 604, 337 P2d 972 (1959).

■ The defendants concede that interest is payable, but request us to determine the rate of interest that is applicable and the amount for which they are liable.

We are unable to answer these questions on the basis of the record now before us. It is necessary, therefore, to remand the cause to the trial court for further proceedings to resolve these issues.

Remanded.