Argued April 2, modified and remanded May 16, petition
for rehearing denied June 25, 1974

STEPHAN ET AL, *Appellants and Cross-Respondents,*
*v.* EQUITABLE SAVINGS AND LOAN
ASSOCIATION, *Respondent and Cross-Appellant.*

522 P2d 478

*Charles F. Hinkle,* Portland, argued the cause for appellants. With him on the briefs were Jeffrey Michael Alden, Velma Jeremiah and Davies, Biggs, Strayer, Stoel & Boley, Portland.

*John R. Faust, Jr.,* Portland, argued the cause for respondent. With him on the brief were Robert D. Rankin and Cake, Hardy, Buttler, McEwen & Weiss, Portland.

Before O'CONNELL, Chief Justice, and DENECKE, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

TONGUE, J.

This is a suit by beneficiaries of an alleged testamentary trust to remove the trustee and for an accounting and damages. The trial court held that there was a trust and that defendant had breached the trust and removed the defendant as trustee, but did not order an accounting and limited its award of damages to $1,470.41. Plaintiffs appeal. Defendant cross-appeals.

Plaintiffs contend that: (1) beginning in 1941 the trust fund of $50,000 should have been invested in part in common stocks, which would have increased the corpus by over 400 per cent and the income by 150 per cent; (2) in the alternative, the court should have required defendant either to (a) account for profits earned in reinvesting the fund for its own benefit, or (b) pay interest at the legal rate of six per cent on the full amount of the corpus from 1941.

Defendant, in its cross-appeal, contends that: (1) no trust was created, (2) even if there was a trust defendant was obligated only to maintain the account in effect and had no obligation to invest in common stocks, and (3) plaintiffs' claim is also barred by their acquiescence in defendant's manner of handling the account.

The facts are important to a decision of the issues arising from these contentions.

*The facts.*

Paul Stephan died in 1937 leaving a will under which a $50,000—four per cent "coupon bond" issued by defendant was left in defendant's "custody" in trust, with the income payable to his wife during her lifetime and the principal of the "trust fund" payable to his children when each reached 30 years of age.①

---

① The complete provision reads as follows:

"*FOURTH:* I am the owner of a $50,000.00 *Coupon Bond* issued by the Equitable Savings and Loan Association of Portland, Oregon; that such coupon bond draws interest at 4% from the date of issue on September 4, 1936, interest being payable each six months thereafter. It is my will and desire that immediately upon my death the *said bond or any re-issue thereof, or any other bonded security into which I shall have directed its transfer, shall be left in trust in the custody of said Equitable Savings and Loan Association* of Portland, Oregon, during the lifetime of my said beloved wife, Anna Stephan, and that the interest from *said bond or any re-issue thereof, or any other bond or negotiable instrument into which* the principal sum of $50,000.00 *shall have been converted,* shall be paid semi-annually, as the interest shall fall due, to my said beloved wife, Anna Stephan.

"That upon the death of my said beloved wife, Anna Stephan, I give and bequeath to my said son the sum of Nine Thousand ($9000.00) Dollars, in order to equal approximately the sum advanced to my said daughter. Said sum to be paid out of the $50,000.00 *trust fund.* Thereupon, I give and bequeath the balance of said $50,000.00 *trust fund,* principal and interest then due, to my said daughter, Elsie

An order was entered in 1938 approving a final accounting under which the wife, as executrix, was directed to "turn over" to defendant the $50,000 "coupon certificate." The order also stated that Mrs. Stephan was declared to be the owner of "Coupon Certificate No. 4416 in the name of Paul Stephan * * *." Defendant then undertook to pay four per cent interest semi-annually to Mrs. Stephan. The certificate "terminated" in 1941.

Mr. Stephan had been a baker in Coos County. Mrs. Stephan, who left school at the age of 10 years, read the will after her husband's death and at that time talked with one of the attorneys who probated the estate.[⊗]

The original coupon bond terminated or "matured" on September 20, 1941. On May 27, 1941, Mrs. Stephan wrote the following personal letter to defendant:

"Would it be possible for me to get one Thousand dollars—and what percentage do you charge I would like to have it for one year—as all of our

Gertrude Stephan, and to my said son, Hugo Paul Stephan, in equal parts, share and share alike, provided that they have attained the age of thirty (30) years. And in the event either or both of my said children have not reached the age of thirty years, his, her, or their share shall be kept *in trust* until they shall have attained the age of thirty years, at which time it shall be distributed to them and each of them. It is my wish, however, that the income or interest from their respective shares shall be paid over to them and each of them during such *trust period.*

"In the event of the dissolution of the said Equitable Savings and Loan Association, I herewith nominate the United States National Bank of Portland, Oregon, as successor to carry out the functions hereinabove in this clause given to the said Equitable Savings & Loan Association." (Emphasis added)

[⊗] In 1939 she also consulted another attorney, who wrote to defendant, enclosing a copy of the will, and asking that the interest payments be made to her as they became due.

savings are invested in a *trust fund*—it makes it dificult for me to live and send my boy to college also. I don't supose there is any possible chance for us to draw on the *trust fund*—if I could do that then I would not have to borrow" (Emphasis added)

Defendant responded as follows:

"We have your letter of recent date asking if it is possible for you to secure the sum of $1000.00 against your coupon certificate #4416, which under the Will of your late husband was placed in a *trust fund for your benefit.*

"Under the terms of his last Will and Testament, there is no provision whatsoever for any loans against the account. *It must rest as it is during your lifetime* and the only funds that may be paid to you are the interest payments from this certificate or any reissue thereof." (Emphasis added)

On October 20, 1941, after the coupon bond "matured," defendant mailed Mrs. Stephan an "application for a new *bond*" for $50,000 for a three year term, paying three per cent interest, instead of four per cent. Mrs. Stephan then apparently consulted J. A. Berg, an attorney in Coquille.

Mr. Berg then wrote to defendant as follows:

"* * * After going over this matter with my clients, it is deemed advisable at this time that this bond, or the greater portion thereof, should be converted into Government bonds, as this particular sum is practically the whole of the estate and it is deemed inadvisable to leave the whole of this amount in one security.

"It is my belief that upon application of your Company, or upon authority which Mr. Stephan may have left with you prior to his death, this bond could at this time be transferred into other securities and held in trust by you as provided in the

Will. I assume that your Company would agree that as a matter of precaution and good business for these heirs, that in no event should the whole of an estate be left in one security, especially in a time of stress and insecurity, even though we do not question the stability of your organization.

"I believe Mrs. Stephan has received a request that she make a new application for a 3% bond, and it is possible, therefore, that the interest on this bond has already been reduced twenty-five percent, with a possibility, of course, of further decreases in the income to the widow during her lifetime. We dislike very much making application for a new bond at this time, unless it is understood that there would be no discount on the bond at the time of its transfer into other securities, that is, that this bond would be taken up by your Company, in the event of a change, at its face value."®

Defendant apparently then sent a "representative" to call on Mr. Berg. On October 31, 1941, Mr. Berg mailed to defendant a "signed waiver authorizing you to transfer the maturity value of account No. 4416 to the new account subscribed for." Defendant then mailed the five $10,000, three per cent, "coupon certificates" to Mrs. Stephan.

When these bonds "matured" three years later defendant, on September 14, 1944, mailed to Mr. Berg applications for the reissue of the "bonds" for three more years, with interest reduced to two per cent, which was stated to be "a very satisfactory rate consistent with the safety that is offered with this type of investment." Mr. Berg then mailed to defendant the five

---

® In that letter Mr. Berg stated that he represented not only Anna Stephan, but also her daughter Elsie and her son Hugo, both of whom testified on trial that they never talked with him at that time and that they were never represented by him.

"old bonds" and defendant mailed to him "five new $10,000 bonds in the name of Anna Stephan."

One year later, in 1945, Elsie Stephan, the daughter, wrote to defendant to inquire what "legal steps are necessary" to have the entire "trust fund" turned over to her mother as it "should rightfully have gone" at the beginning. Defendant's president responded as follows:

"* * * I have again examined the will and find that the $50,000 referred to in your letter is provided for in Paragraph No. 4. *It is to be left in trust with the Equitable Savings and Loan Association* during the life time of Anna Stephan, and all the income from *said trust fund* is to be paid to her during her life. Upon her death $9,000 of said sum is to be paid to your brother, leaving $41,000 to be divided equally between your brother and yourself.

"Under these circumstances I do not see that you are gaining anything by transferring your interest to your mother, and it would mean that when it came back to you upon her death you would have to pay another tax. She now receives all of the income and the principal cannot be expended so I think everything has been done that can be done." (Emphasis added)

Elsie Stephan did not pursue the matter further at that time and testified that she never consulted Mr. Berg about this matter and that she had no criticism of the manner in which defendant handled the "trust fund" until she talked with her brother (who had been out of the country) in about 1969.

The bonds were again "reissued" in 1947 and 1950 and on October 16, 1950, Mr. Berg mailed to defendant "applications and transfer vouchers for the new reissued bonds," all "signed by Anna Stephan as requested."

When these bonds "matured," three years later, defendant ceased to issue and offer "coupon bonds" or "certificates," but instead offered what was called "matured passbook accounts," under which interest could be paid to Mrs. Stephan semi-annually, as in the past.

On September 1, 1953, defendant wrote to Mrs. Stephan as follows:

"We are writing to confirm our conversation with you of last week, regarding the maturity of your Coupon Bonds #7223, #7224, #7225, #7226, and #7227. All of these bonds will mature October 9, 1953, at which time you may cash the last coupon on each, and at which time *all of the bonds will go on the Preferred Basis.*

"To continue to receive your earnings semi-annually on this investment, please sign the enclosed authorization after the word 'Owner', and return it to this Association. The first check will represent earnings from October 9, 1953 to December 31, 1953. Subsequent checks will be issued each June 30th and December 31st of each year. Your return on this investment will be increased to 2½% each year. In addition you will receive a special bonus of earnings each five years commencing October 9, 1960." (Emphasis added)

Mrs. Stephan replied:

"Please continue sending my allowence—semi-annualy—by cheque—I have not signed as I am not the owner of the investment—"

There is nothing to indicate that during this period in 1953 Mrs. Stephan consulted with Mr. Berg or any other attorney.

From 1953 to 1969 defendant paid interest to Mrs. Stephan at its current rates for "matured passbook accounts," which gradually increased from two and

one-half per cent in 1953 to five and one-quarter per cent in 1969. During this period there is no indication that Mrs. Stephan or her son or daughter consulted an attorney.

In April 1969 Mrs. Stephan wrote to defendant as follows:

"Would it be possable to incrase our intrest on our investment—I only get two thousend per year on, on (fifty thousend)."

The reply to that letter does not appear.

At about that time, however, her son, Hugo Stephan, returned to the United States. On May 30, 1969, he wrote to defendant as follows:

"In reply to your letter dated 20 May and enclosed I am furnishing the following information.

"There are five (5) *bonds* in the amount of $10,000 dollars each which have been with your organization for not less than 40 years. As I remember the last digits on the bonds are—24, 25, 26, 27 and 28." (Emphasis his)

After some further correspondence Hugo Stephan wrote again to defendant on December 22, 1969, enclosing "the cards marked and signed by Mrs. Anna Stephan approving the transfer of funds from acct. 7223, 7224, 7225, 7226 and 7227 to Six Months Saving Certificates" and also indicating that she intended to deposit other funds as well in similar "certificates."

On December 26, 1969, Hugo Stephan wrote again to request information "on leaving a trust with you of one type or another." In response, on January 14, 1970, defendant wrote that:

"We regret to inform you that we do not have a Trust Department."

Later in 1970 plaintiffs apparently consulted with their present attorneys. By letters dated September 3 and November 4, 1970, their attorneys wrote to defendant to demand "an accounting of the administration of the trust from its inception at the death of Paul Stephan in 1937 to date," including various detailed information.

After some discussions, which apparently included a request that the funds be transferred to the United States National Bank, defendant's attorneys wrote to plaintiffs' attorneys on May 27, 1971, as follows:

"* * * As you know, Equitable does not have trust powers such as are vested in the First or U.S. National Banks. In any event the executrix first and final account asks that 'the turning over by her of the savings certificate represents $50,000 to the Equitable Savings & Loan Association be confirmed and ratified' which apparently it was.

"We expressed, at the time of our discussion, some reluctance about transferring the funds because of the explicit provisions of the will. When the will was probated a Trustee should have been appointed to administer the funds held by Equitable and to transfer same according to the testator's directions. Perhaps the estate could be reopened and a Trustee appointed at this time. * * *"

This lawsuit was filed a year later. At the trial, and in addition to evidence of the foregoing facts, plaintiffs called as an expert witness the trust officer of a Washington bank who testified that beginning in the "early 1940's" a prudent trustee would have invested 50 per cent of the trust fund in common stocks and 50 per cent in bonds and that by doing so the corpus of the trust would have increased by 400-450 per cent and the income of the trust by 300 per cent.

No evidence was offered by either party to show what would have resulted from investment of the trust fund in government bonds or in other types of bonds.

1. *Defendant assumed to act as a trustee and was subject to the duties of a trustee.*

Defendant contends that no trust was created. In support of that contention defendant says that "the fact that the settlor uses the word 'trust' does not necessarily indicate that a trust was intended," quoting from 1 Restatement of the Law of Trusts 2d § 24, Comment *b* (1959). Defendant also says that many of the usual indicia of a trust are lacking in this case in that the provisions of the will do not vest title to the money in defendant, do not designate it as "trustee," give it no "powers" to deal with the account and do not provide for compensation to it as a trustee.[2] Defendant also points out that as a savings and loan association organized under Oregon law it was and is prohibited by law from acting as a trustee and from buying stocks and bonds, citing OCLA 40-402 and 41-701 (see ORS 706.005 (24); ORS 709.030 and ORS 707.030, repealed by Oregon Laws 1973, ch 797, § 428).

It is clear from the record, however, that defendant undertook and assumed the management of the $50,000 which, according to the terms of the will

---

[2] In a number of cases it has been held that where the terms of a testamentary trust are too uncertain to be carried into effect, such a trust will fail and the beneficial interest under such a trust will be transmitted by the residuary provisions of the will. See Annot., 30 ALR3d 1330 (1970). See also 1 Restatement of the Law of Trusts 2d § 411 (1959). The residuary beneficiary of this will was the wife of the testator, Anna Stephan. No such contention has been made by her as a plaintiff in this case. On the contrary, all plaintiffs contend that a valid trust was established by the terms of this will.

of Paul Stephan, was left as a trust fund for the benefit of his wife and children. It is also clear that in doing so defendant informed Mrs. Stephan that it was holding the $50,000 as a "trust fund" for her benefit and that "it must rest as it is during your lifetime." A similar statement was made by defendant to Elsie Stephan, the daughter. It also appears that Mrs. Stephan and her daughter believed, acquiesced in, and relied upon those statements by defendant for many years.

As stated by this court in *Elliott v. Mosgrove,* 162 Or 507, 530, 91 P2d 852, 93 P2d 1070 (1939):

"* * * A person who assumes the duties of a trustee and proceeds with their administration is as liable for their improper conduct as if he had been regularly appointed. The truth of this statement is illustrated by the many instances of implied trusts. * * *"

To the same effect, see *Grandy v. Williams,* 147 Or 409, 417, 34 P2d 622 (1934).

■ As for defendant's contention that it was prohibited by law from acting as a trustee, it is well established in Oregon that a corporation which has entered into a contract in excess of its granted powers and has received the benefit of the contract is estopped to deny its power to do so or its liability for breach of the resulting duties. *Seeck Mfg. Co. v. American Trust Co.,* 143 Or 314, 322, 20 P2d 1065, 22 P2d 325 (1933); *Roane v. Union Pac. Life Ins. Co.,* 67 Or 264, 279, 135 P 892 (1913).

This court has not previously had occasion to apply this rule to a case involving facts similar to those of this case. However, in *Secretary of Banking, Pennsylvania v. Taylor Discount and Deposit Bank,*

41 Lack Jur 111 (Cty 1932), an executor deposited funds under a "trust agreement" in a bank which had no authority to conduct a trust business. Under such facts the court held that:

> "* * * [T]he fact that the Bank had no authority to carry on a trust business did not destroy the quality of the account as a trust rather than as a mere debtor and creditor relationship. Even if the Bank was not qualified to carry on trust functions, the acceptance of the deposit and the agreement to carry out the terms of the decedent's will set up at the very worst a resultant trust. Section 411, Re-Statement of Trusts."

To the same general effect, although not involving a bank or financial institution, it was held in the leading case of *Penn v. Fogler*, 182 Ill 76, 55 NE 192, 197 (1899), which involved an administrator with will annexed who exceeded his authority under a decree in the investment of trust funds, that:

> "If the decree did not confer upon Brown, administrator * * * the authority to execute the trust in regard to the bank stock, his acts in so doing constituted him a constructive trustee or a trustee de son tort. Where one without authority undertakes to execute a trust requiring the investment of a fund, he must himself carry all the risks, and make good all the losses, and have none of the profits * * *. 'A person may become a trustee by construction by intermeddling with, and assuming the management of, trust property without authority. Such persons are trustees de son tort.' Perry, Trusts (3d Ed.) § 245; Morris v. Joseph, 1 W. Va. 256; Piper v. Hoard, 107 N.Y. 73, 13 N.E. 626. 'During the possession and management by such constructive trustees, they are subject to the same rules and remedies as other trustees; and they cannot avoid their liability by showing that they were not, in fact, trustees, * * *)'"

See also *Hirt v. Bucklin State Bank of Bucklin,* 153 Kan 194, 109 P2d 171, 177 (1941), and 1 Restatement of Trusts 2d § 33 (1959).

■ For all of these reasons, we hold that because defendant undertook and assumed to administer and manage the $50,000 "trust fund" in accordance with the provisions of the will of Paul Stephan, it cannot now deny its authority to act as a trustee but, on the contrary, is subject to all of the duties of a regularly appointed and fully qualified trustee, as well as liability for breach of any of such duties.

2. *Defendant's performance of its duties as trustee—1938 to 1953.*

A. *Continued investment in bonds.*

Defendant next contends that if a trust was created its obligations as trustee were limited by the terms of the will to investments in bonds and that it was prohibited from investing any portion of the trust fund in common stocks.

Plaintiffs contend, on the contrary, that defendant, as trustee, was under a duty to invest the trust funds as a "reasonable prudent trustee" would have done; that investments by such a trustee would have included common stocks, and that by failing to do so defendant breached its duty as trustee and should be held liable in damages for the amount by which the income and corpus of the trust would have been increased by such an investment program.

In support of that contention plaintiffs say that the use of the words "negotiable instrument" in Paragraph IV of the will was sufficient to demonstrate an intent by Mr. Stephan to authorize the trustee to invest in common stocks, as well as in bonds, when

the existing "coupon bond" matured. Plaintiffs also say that an intent to authorize investment of the trust fund in stocks must be presumed as a result of the adoption in 1935 by the Oregon legislature of the Uniform Stock Transfer Act (Oregon Laws 1935, ch 239), under which it has been held that a trustee may invest in common and preferred stocks.

From an examination of the provisions of the will, and considering the state of the law at that time relating to the investment of trust funds, we do not believe that Paul Stephan had such an intent. On the contrary, we are inclined to the belief that Mr. Stephan intended that the entire trust fund of $50,000 be invested in bonds, rather than in stocks, and agree with the holding by the trial court to that effect.

Section 22-1214, Oregon Code 1935 Supp., as in effect at that time, was a "legal list" for "Funds held in trust by any trust company," and it was exclusive. It permitted investment in United States government bonds, certain state and municipal bonds, bonds other than foreign bonds listed on the New York, Boston, Chicago or San Francisco stock or bond exchange and certain curb bonds and bonds of other approved exchanges meeting certain rating requirements, Canadian and British bonds payable in dollars, notes and bonds secured by first mortgages, and investments agreed upon between the trustee and trustor or approved by the court.

This court held in *Marshall v. Frazier*, 159 Or 491, 533-34, 80 P2d 42, 81 P2d 132 (1938), that in the absence of express authority from the trustor:

"* * * Neither in the original act nor in the amendments thereof is any trust company given authority by the legislature to invest * * * While

those statutes do not apply to trustees of private trusts, they may be understood as indicative generally of the kinds of investments regarded by the legislature as safe and suitable for trust funds not specifically directed by the trust instrument to be otherwise invested. * * *"

In *Kinney v. Uglow*, 163 Or 539, 98 P2d 1006 (1940), construing a trust instrument which allowed reinvestment in "some safe, interest-bearing security, approved by the court having jurisdiction hereof," the court held (at 578) that "Shares of stock in a corporation are not interest-bearing securities." It was held that the trustee was in breach of trust even though he had obtained court approval for an investment in stocks because he had failed to apply to the court for a construction of the will, under which no authority was given to invest in stocks.

■ For these reasons we hold that defendant was not authorized to invest in stock, at least in the absence of either express authority from the court or express approval by all beneficiaries of the trust.

This brings us to plaintiffs' further contention that defendant had a duty to apply to the court for instructions. According to 1 Restatement of Trusts 2d § 259 (1959):

"The trustee is entitled to apply to the court for instructions as to the administration of the trust if there is reasonable doubt as to his duties or powers as trustee."

■ While it may have been appropriate for defendant to do so, we do not believe that under the facts and circumstances of this case defendant was required to do so. It appears that when the original $50,000 "coupon bond" matured in 1941 Mrs. Stephan

consulted an attorney who wrote to defendant that he not only represented her, but her son and daughter as well, and suggested that "this bond, or the greater portion thereof, should be converted into Government bonds" and did not suggest that any part of the proceeds be invested in stocks. It also appears that Mrs. Stephan then, while apparently acting under the advice of counsel, expressly consented to the reinvestment of the entire fund in three per cent "coupon bonds" issued by defendant and that every three years thereafter she also expressly consented to the reinvestment of the entire fund in other "coupon bonds" bearing interest rates as low as two per cent per annum until 1953, when the last of these bonds matured and defendant ceased the issuance of such bonds. At all times prior to 1953 the reissuance of these "coupon bonds" was handled through an attorney representing Mrs. Stephan.

■ It is true that consent by a beneficiary does not preclude him from holding a trustee liable for breach of trust if such consent was induced by improper conduct of the trustee or if the trustee has an adverse interest and the transaction is not fair and reasonable. 1 Restatement 2d, *supra,* § 216 (2) (c), and Comments *k, l, m* and *n.* In this case, however, while it may be true that Mrs. Stephan was a person of limited understanding and experience and that defendant did not inform her of all of the rights which she may have had, it appears that during this entire period from 1941 to 1953 she was acting under the advice of an attorney.

Under these facts, we hold that defendant was under no duty to make application to the court for a construction of the will on the question whether or

not it was authorized to reinvest any portion of the trust fund in stocks, rather than in bonds. Under these same facts, it is clear that there was no consent by the beneficiaries of the trust to invest any portion of the trust fund in stocks, rather than in bonds. It follows that defendant did not breach its duty as trustee by failing to reinvest any portion of the trust fund in common stocks, contrary to the present contentions by plaintiffs.

B. *Investment in defendant's own bonds.*

Plaintiffs also contend that defendant was guilty of a violation of its duties as a trustee during this same period in that it invested the entire trust fund in its own "coupon bonds," from which defendant made a profit, and in failing to dispose of that investment.

■■ It is well established, of course, that a trustee may not use trust property for his own purposes and that, for this reason, a bank cannot (with certain statutory exceptions) deposit trust funds in its own banking department or invest trust funds in its own securities because by doing so it is dealing as an individual with itself as a trustee. See 1 Restatement, *supra,* § 170, Comments *l* and *m,* and § 206, Comment *j*; 2 Scott on Trusts (3d ed 1967) 1356-362, § 170.18. On the contrary, a trustee is ordinarily under a duty to dispose of any such improper investment within a reasonable time. See 1 Restatement, *supra,* §§ 209 and 230. A trustee has no such duty, however, if by the terms of the trust instrument it is authorized to retain an investment in its own securities. See Annot., 47 ALR2d 187, 193 (1956).

■ In this case the provisions of the will expressly authorized defendant to hold in trust its own $50,000

"coupon bond" "or any re-issue thereof." Thus, defendant was not required to dispose of such bonds and to reinvest the proceeds and was not chargeable with any resulting profit made by it. Again, although not necessary to a determination of this question, it is of interest to note that Mrs. Stephan, after consultation with counsel, expressly consented to the reissue of further "coupon bonds" upon the maturity of the original bond during the interim period from 1941 to 1953.[6]

## C. *Other alleged breaches.*

Plaintiffs charge that defendant also was guilty of further breaches of trust by failing to protect the trust fund against inflation, by failing to account for profits made by defendant by the investment of trust funds in its own securities, and by failing to provide federal deposit insurance.

■ By deciding, as we have held, that defendant was under no obligation to invest in stocks, rather than in bonds, it follows that defendant did not breach its trust duties by failing to protect against inflation. This is true because the protection against inflation that may be provided by investment in stocks is not normally possible by investment in bonds.

---

[6] Because such conduct was authorized by the terms of the will we need not consider the absence of consent by testator's son and daughter. It would appear, however, that as residuary beneficiaries they had no interest in the income from the trust fund, with the result that they may not have been entitled to an accounting of any profits earned by defendant by investing such funds in its own bonds, but only to hold defendant liable for any loss or depreciation suffered by the corpus of the trust, which suffered no loss in this case. We need not, however, decide that question.

■ As for defendant's failure to account for profits, such a duty has application only to a trustee who is barred from the investment of trust funds in its own securities or accounts, as in the normal case. As previously held, however, the terms of this trust expressly permitted defendant to invest the trust funds in its own bonds.

Finally, as for defendant's failure to provide insurance to protect the trust funds, plaintiffs make no contention that any loss or damage was suffered as the result of any such failure.

3. *Defendant's performance of its duties as trustee—1953 to 1972.*

A. *Breach of duties by investment in "matured passbook account" on termination of "coupon bonds."*

By 1953 defendant had ceased issuing "coupon bonds" or any other form of bonds. At that time, and upon the maturity of the "coupon bonds" then held in trust, defendant reinvested the trust funds in "matured passbook accounts." Plaintiffs contend that the provisions of the will did not authorize such an investment of trust funds and that there was no valid consent by plaintiffs to such an investment, with the result that in making such an investment of the trust funds defendant breached its duty as a trustee. (See 1 Restatement of Trusts, *supra*, § 170, Comments *l* and *m*; § 206, Comment *j*, and §§ 170, 206, 209 and 230; 2 Scott on Trusts, *supra*, 1356-362, § 170.18; and Annot., 47 ALR2d 187, 193 (1956), as previously discussed.)

■ By the terms of the testamentary trust the investment of the trust fund was limited to the original

$50,000 "coupon bond," "or any re-issue thereof, or any other bond or negotiable instrument into which the principal sum of $50,000 shall have been converted." According to the evidence, a "matured passbook account" was virtually an open passbook type of account. As such, it was neither a bond nor a negotiable instrument. Thus, we must hold that the trust instrument in this case did not authorize the investment by defendant of the funds of this trust in its own "matured passbook accounts."

■ Assuming, but not deciding, that such an investment of the funds of this trust could have been authorized by the consent of Mrs. Anna Stephan, we also hold that there was no valid consent by her to such an investment. It is true that Anna Stephan acquiesced in this change. It does not appear, however, that before doing so she again consulted an attorney or that the transaction was handled through an attorney, as was true at the maturity of all of the previous "coupon bonds." There is also nothing in the record to show what, if any, explanation was made to her by defendant of the reasons for or effect of such a change other than that she was told by a representative of defendant that "we were not going to be renewing the coupon bonds which we were no longer offering"; that "her money would be put in what we referred to as a 'matured account basis'" and that "the money had to stay with Equitable during her lifetime."

Defendant's letter to her dated September 1, 1953, stated only that:

"* * * All of these bonds will mature October 9, 1953, at which time you may cash the last coupon on each, and at which time *all of the bonds will go on the Preferred Basis.*

"To continue to receive your earnings semi-annually on this investment, please sign the enclosed authorization after the word 'Owner', and return it to this Association. * * *" (Emphasis added)

■ In view of the fiduciary nature of defendant's duties to Mrs. Stephan, we hold that it had the burden of proof to establish that it clearly explained to Mrs. Stephan, an elderly woman whose schooling had ended at age 10, not only that it had ceased to issue "coupon bonds"; but that what it was proposing to do was not to reinvest the trust fund in either bonds or negotiable instruments, as provided by the will, but to reinvest the trust fund in one of its own passbook accounts, which was neither a bond nor a negotiable instrument and was a form of investment on which defendant would expect to earn a profit, cf. 1 Restatement, *supra*, § 216, Comment *k, l, m* and *n*.[®]

Upon examination of the record we find that defendant failed to satisfy that burden of proof.

Accordingly, and for all of these reasons, we hold that when in 1953 defendant reinvested the trust

---

[®] 1 Restatement of Trusts 2d § 216 (1959), Comment *k,* states that:

"* * * Since the trustee is in a fiduciary relation to the beneficiary, he should inform the beneficiary of his rights and of material facts affecting a transaction which is a deviation from the terms of the trust, in so far as the trustee knows or should know these facts. The consent of the beneficiary does not preclude him from holding the trustee liable for a deviation from the terms of the trust, unless the beneficiary understands that the transaction is a deviation from the terms of the trust and that he is entitled to require the trustee to administer the trust according to its terms. It is not necessary that the trustee should inform the beneficiary of all the details of which the trustee knows, but he should see that the beneficiary is sufficiently informed so that he understands the character of the transaction and is in a position to form an opinion as to its advisability."

fund in its own "matured passbook accounts" it breached its duty as a trustee. It may be that defendant was also under a duty to explain to Mrs. Stephan that it had no legal authority to conduct a trust business, which it did not do. We need not, however, decide that question.[②]

### B. Defendant's claim of laches.

Defendant contends that plaintiffs are barred by laches from complaining of such a breach by their apparent acquiescence from 1953 to 1970.

In order to constitute laches there must have been full knowledge of all of the facts, concurring with a delay for an unreasonable length of time, and laches does not start to run until such knowledge is shown to exist. *Wills v. Nehalem Coal Co.*, 52 Or 70, 89, 96 P 528 (1908).; *Kelly v. Tracy*, 209 Or 153, 172, 305 P2d 411 (1956). In addition, the delay must result in substantial prejudice to the defendant to the extent that it would be inequitable to afford the relief sought against the party asserting laches as a defense. *Dahlhammer and Roelfs v. Schneider: Exec.*, 197 Or 478, 498, 252 P2d 807 (1953); *Hanns v. Hanns*, 246 Or 282, 305, 423 P2d 499 (1967). Thus, the doctrine of laches is not an inflexible rule, but its application depends upon the particular circumstances of each case. *McIver v. Norman*, 187 Or 516, 544, 205 P2d 137, 213 P2d 144 (1949). See also *Willis v. Stager*, 257 Or 608, 618-19, 481 P2d 78 (1971).

---

[②] It also appears that the son and daughter, as residuary beneficiaries, did not consent to such a reinvestment of the trust funds. Again, however, we need not decide whether or not their consent was required or whether such consent, together with that of Mrs. Stephan, would have authorized such an investment of the trust funds.

■ We hold that these requirements were not satisfied in this case. Defendant failed to show that Mrs. Stephan acquired the required "full knowledge of all of the facts" at any time prior to 1970. We have already discussed some of these facts. In addition, the trial court found that she was unaware until 1970 of defendant's lack of legal authority to administer a trust. We agree with that finding. Defendant also failed, in our opinion, to show that the delay in this case would result in substantial prejudice to the extent that it would be inequitable to afford to plaintiffs the relief sought by them.

4. *Defendant's liability for breach of duties as trustee.*

Defendant contends that there was no evidence upon which to base an award of damages.

The trial court held that defendant breached its duties as trustee beginning in 1941, instead of 1953, but rejected plaintiffs' contention that defendant's liability should be determined by the amount that the income and corpus of the trust would have increased had 50 per cent been invested in common stocks. It held instead that defendant's liability for such a breach was limited to any difference between the income produced by defendant's investment of the trust fund in its own bonds and accounts and the income that would have been produced had the trust fund been invested by a reasonable and prudent investor in other bonds, beginning in 1941. Because the trial court found that there would have been no difference it awarded no damages for breach of trust prior to September 3, 1970, the date on which plaintiffs first demanded an accounting.

■ As previously stated, we agree that defendant had no duty to invest any portion of the trust fund in

common stocks. We do not agree, however, that its liability was discharged because the income as produced by defendant's investment in its own bonds and accounts may have equalled the income that would have been produced by investment of the funds in other bonds. The reason that we cannot agree with such a disposition of the case is that it would overlook the responsibility of a trustee who uses trust funds for his own benefit to account for any and all resulting profits. 1 Restatement of Trusts 2d, *supra,* § 203.

Plaintiffs have contended that as alternative relief they were entitled to either (1) an accounting for any and all such profits or (2) an assessment of interest at the legal rate of six per cent per annum on the amount of the funds held in trust during period of such a breach of duty by the trustee, whichever is greater. As previously stated, we have found that this period began on October 9, 1953, when defendant transferred the investment of the trust funds from "coupon bonds" into a "matured passbook account."

Although defendant has shown good reason why it should not be charged with damages computed upon the basis of an investment of any portion of the trust fund in common stocks, it has shown no good reason why either of the other alternatives should not be adopted other than to contend that plaintiffs are barred by laches and estoppel—a contention we have already rejected.

In *Duniway v. Barton,* 193 Or 69, 88-89, 237 P2d 930 (1951), although under somewhat different facts, this court had occasion to consider this problem and held as follows:

"The plaintiff, * * * is not for these reasons [uncertainty of proof of the amount of profits] to

be deprived of a remedy. In such a case the beneficiary of the trust is entitled to recover interest, in many instances compounded, on the amount of the fund misapplied and used in the trustee's own business. We quote from the authorities:

" '* * * Where the trustee has used trust funds in his own business, the court will not usually give to the trust a definite share of the profits, but will charge the trustee with interest at a rate based to some extent upon the size of the profits earned in the business if the rate of return is larger than simple interest at the legal rate.' 1 Perry on Trusts and Trustees (7th ed.) 715, § 429.

" 'If the trustee uses trust funds in his own business and it does not appear how much he has earned thereon, he is ordinarily chargeable with compound interest on the ground that he probably received a return from the trust fund so used at least equal to compound interest.' Restatement, Trusts, 568, Comment d.

" 'Whether simple or compound interest shall be allowed, where interest is the basis, is a question of discretion and fact in each case. If simple interest will adequately compensate the cestui que trust, it will be added; if compound interest will more accurately make the beneficiary whole, then that standard of computation will be followed.' 4 Bogert, Trusts and Trustees, Part 1, 420, § 863.

" '* * * As Chancellor Walwroth said: "Stating the account with periodical rests, and compounding interest, is only a convenient mode, adopted by the court to charge the trustee with the amount of profits supposed to have been made by him in the use of the money; where the actual amount of profits, which he has made, beyond simple interest, cannot be ascertained." Compound interest is, however, more often allowed in cases involving fraud,

willful misconduct, or other gross delinquency,
than in instances of honest mistake or bad
judgment.' 4 Bogert, *op. cit.*, 423, § 863."

See also *Marston v. Myers et ux,* 217 Or 498,
514, 342 P2d 1111 (1959); *Marshall v. Frazier,* 159 Or
491, 535, 539, 80 P2d 42, 81 P2d 132 (1938); and
*Collins v. Collins,* 168 Or 666, 674, 126 P2d 512 (1942).
Cf. *Brown v. Stephenson,* 171 Or 239, 247, 137 P2d
289 (1943), and *Fitchard v. Hirschberg's Estate et al,*
128 Or 317, 329, 272 P 906, 274 P 505 (1929). See also
Note, 17 Or L Rev 47, 61 (1937).

As stated in *Duniway v. Barton, supra,* the
allowance of interest in such a suit in equity, including
the manner in which such interest is computed (i.e.,
whether at simple or compound interest), is a matter
largely within the discretion of the court and depends
upon the facts and circumstances of each case. See
also 1 Perry on Trusts and Trustees (7th ed 1929)
794-804, §§ 468-471. Interest may also be allowed in
such a suit under a prayer for general equitable relief,
regardless of whether or not interest was specifically
prayed for in the complaint. See *Cross of Malta Bldg.
Corp. v. Straub,* 257 Or 376, 384, 476 P2d 921, 479 P2d
505 (1971).

In many cases in which a trustee has mingled trust
funds with his own or has used such funds in his own
business, courts have held that the trustee should
be charged with not less than interest at the legal rate
and that if the trustee has made more than legal in-
terest he may also be charged with all of the profit
received from the use of the trust funds. See cases
collected in Annots., 37 ALR 447, 459 (1925); 55 ALR
950, 952 (1928); 112 ALR 833, 838 (1938); and 156
ALR 936, 944 (1945). Indeed, this appears to be the

rule as adopted by this court in *Duniway* (at 69), in which it cited with approval the statement of that rule in 1 Perry on Trusts and Trustees, *supra*, 715, § 429.

In this case this alternative measure of damages, as sought by plaintiffs in the trial court, was "six per cent interest on the full sum of the corpus, less the amounts which were actually paid by defendant, compounded annually from 1941."

■ Because, however, we have held that defendant's liability for breach of trust did not commence until October 9, 1953, the award of interest at the legal rate of six per cent per annum on the sum of $50,000 must be computed to begin as of that date. As proposed by plaintiffs, the amounts actually paid by defendant shall be deducted. Cf. *Duniway v. Barton, supra* at 90, and *Collins v. Collins, supra* at 674.

The question remains whether the balance shall be compounded annually, as requested by plaintiffs. In other words, for the year 1954, during which defendant apparently paid interest at two and one-half per cent to Anna Stephan, should the difference between two and one-half per cent and the legal rate of six per cent, i.e., interest at the rate of three and one-half per cent, be compounded as of the end of that year?

As stated in *Duniway v. Barton, supra* at 89, quoting from 4 Bogert, Trusts and Trustees (2d ed 1962) 423, § 863:

"* * * Compound interest is * * * more often allowed in cases involving fraud, willful misconduct or gross delinquency."

However, according to 1 Restatement of Trusts 2d § 207, Comment *d* (1959):

"If the trustee uses trust funds in his own

business and it does not appear how much he has earned thereon, he is ordinarily chargeable with compound interest on the ground that he probably received a return from the trust fund so used at least equal to compound interest."

To the same effect, see 1 Perry on Trusts and Trustees, *supra,* 801-803, § 471. See also *State v. Schachat,* 120 Conn 337, 180 A 502 (1935); *St. Paul Trust Co. v. Kittson,* 62 Minn 408, 65 NW 74 (1895); and *In re Comstock's Will,* 219 Minn 325, 17 NW2d 656 (1945). But see *In re Reed's Estate,* 37 Wyo 107, 259 P 815 (1927).

Although the cases are in great conflict on this question, we believe that under the circumstances of this case interest should be compounded annually at a rate representing the difference between the legal rate of six per cent and the rate actually paid by defendant to Anna Stephan, beginning as of October 9, 1953, and continuing until the trust funds are paid over by defendant to the successor trustee as appointed by the decree and judgment of the trial court.[®]

Finally, we come to the question whether, in addition to such an award of interest, plaintiffs are entitled to an accounting for the purpose of determining whether, as a result of the use of the trust funds for its own benefit, defendant made profits in excess of interest at the rate of six per cent.

As previously stated, the principal reason for the rule under which a trustee who commingles trust

---

[®] There shall be no deduction in favor of defendant, however, in the event that at any time prior to the turning over by defendant of the trust fund to the successor trustee it shall pay interest at a rate in excess of six per cent per annum to Anna Stephan.

funds with his own funds and uses such funds in his own business may be charged with interest at not less than the legal rate is that in such a case it is often difficult, if not impossible, to accurately determine by an accounting the actual amount of profit made by the trustee from the use of the trust funds. Thus, in suits for an accounting, this court, depending upon the circumstances, has made awards of interest as final determinations of such cases and has remanded them for computation of such amounts and entry of final judgments or decrees in such amounts, rather than to remand such cases for further proceedings under which the trustees would be required to render accountings for profits. See *Templeton v. Bockler,* 73 Or 494, 509-10, 144 P 405 (1914); and *Duniway v. Barton, supra* at 90.

 Such further proceedings may be proper under other circumstances, as in cases in which it has been shown that there is some reason to believe that the trustee has made profits in excess of the legal rate of interest. Upon consideration of the circumstances of this case, however, including the difficulty and expense involved in an attempt to arrive at an accurate accounting of the profits earned from the use of these funds, we believe that a final judgment and decree should be entered upon the remanding of this case, to include an award of interest, to be computed as previously stated, but without provision for a further accounting. In all other respects the judgment and decree of the trial court is affirmed.

Modified and remanded.

HOWELL, J., specially concurring.

I agree with the majority that plaintiffs are entitled to prevail. Plaintiffs have requested either an

accounting for all profits resulting from the use of the trust funds or an assessment of interest at six per cent, whichever is greater. The majority concludes that it is in plaintiffs' best interests to forego the accounting because it would be too difficult and expensive to accomplish. This may well be true, but in my opinion that decision should be made by the plaintiffs, not by the court. The suit should be remanded to grant plaintiffs either an accounting or the award of interest.

O'CONNELL, C. J., joins in this opinion.