Argued February 18, penalty set aside and remanded with directions March 29, reconsideration denied May 12, petition for review denied May 25, 1976

## VINCENT, *Petitioner,*

*v.*

## REAL ESTATE DIVISION, *Respondent.*

(CA 5006)

548 P2d 180

*Paul R. Duden,* Portland, argued the cause for petitioner. With him on the brief were Tooze, Kerr, Peterson, Marshall & Shenker, Portland.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Langtry, Presiding Judge, and Thornton and Howell, Judges.

LANGTRY, P. J.

## LANGTRY, P. J.

Petitioner appeals pursuant to ORS 183.480 from an order of the Real Estate Commissioner suspending for four-and-one-half months his license as a real estate broker. For many years he has been the designated broker for Dean Vincent, Inc., a real estate corporation, pursuant to the requirements of ORS 696.080. The corporation has had numerous offices throughout Oregon and Washington, employing approximately 100 salesmen, of whom 60 were located in Oregon at the times in question. Petitioner testified that he has had overall direction of the organization but that he delegated large parts of the operation to other supervisory personnel. He testified, however, "* * * I was very much involved with the monthly financial statements * * *."

The notice of charges against him break down to nine in number. Several of them were dismissed for lack of sufficient evidence supporting them. The findings of fact against petitioner were: (1) that Dean Vincent, Inc., (hereafter DVI), removed clients' funds from the clients' trust accounts and deposited the same in a savings account where they earned interest and DVI retained the interest in all except one instance without knowledge of the clients and without maintenance of records of interest earned on each deposit; (2) that on December 13, 1974 petitioner caused and permitted DVI to transfer client's trust funds on a sale of Sullivan Glove Company property in Bend, Oregon in the amount of $10,000 from client's trust account to the operational office account and that the deal had not been closed before this use of the funds; (3) that on a "Gay Top Beauty Salon" sale of property DVI accepted a deferred commission whereby $125 per month would be paid to DVI which would retain $100 thereof and would hold $25 per month in trust for the seller; that in three instances the extra $25 of client's funds was retained for operational use of the business by DVI; (4) that between "January 1, 1974, and February 4, 1975,"

[ 915 ]

while they were under petitioner's control DVI withheld funds from the salaries of its employes for a group medical insurance policy but did not pay the same to the insurance company with the result that the employes' health insurance claims were rejected by the insurance company; (5 and 6) that on two real estate deals real estate salesmen who were employes of DVI made purchases of property on their own accounts and gave respectively $7,500 and $7,000 in their personal notes as earnest money payments but that DVI did not put the notes into a neutral escrow account.

The Commissioner concluded that the following laws and rules had been violated:

Finding No. (1) The provisions of ORS 696.240, 696.300(1)(h), (q) and (s) and OAR 863-10-025(1);

Finding Nos. (2) and (3) The provisions of ORS 696.240, 696.300(1)(q) and (s) and OAR 863-10-025(1) and (3);

Finding No. (4) The provisions of ORS 696.300(1)(h) and (q);

Finding Nos. (5 and 6) The provisions of OAR 863-10-025(6).

The Commissioner further concluded that it was the *responsibility* of petitioner to supervise the conduct of DVI so that such practices would not take place.

Petitioner has assigned as error each finding of fact, asserting that it is not supported by substantial evidence and has also assigned as error each conclusion of law, asserting that the finding of fact with reference thereto does not support the conclusion.

The provisions of law and rules found violated are set out in note 1.[1]

---

[1] "Every person, partnership or corporation licensed as a real estate broker, who does not immediately place all funds entrusted to him in his capacity as a real estate broker by his principal or others in a neutral escrow depository in this state, shall maintain a trust fund account with some bank or recognized depository located in this state and place all such entrusted funds therein upon receipt * * *." ORS 696.240.

The evidence disclosed DVI experienced financial difficulties in the latter part of 1974 and early 1975 which finally resulted in a change in managing personnel after the events in question here and in a change in ownership of its corporate stock. The financial difficulties were manifested by overdrafts on the general operational bank account of DVI during at least December 1974 and January 1975. Petitioner alleviated this condition in some measure by deposit-

"(1) The commissioner * * * has the power to suspend or revoke any license * * * at any time where the licensee has * * * in performing or attempting to perform any of the acts [involved in his licensed operation been] * * * guilty of:

"* * * * *

"(h) Failing, within a reasonable time, to account for or to remit any moneys or to surrender to the rightful owner any documents or other valuable property coming into his possession which belongs to others * * *.

"(i) Disregarding or violating any provisions of ORS 696.010 to 696.490 * * *. [This obviously includes the provisions of ORS 696.240 as well as the provisions of all of ORS 696.300.]

"* * * * *

"(q) Any act or conduct, whether of the same or a different character than specified above in this section, which constitutes or demonstrates bad faith, incompetency or untrustworthiness, or dishonest, fraudulent or improper dealings.

"* * * * *

"(s) Commingling the money or other property of his principal or client with his own." ORS 696.300(1)(h), (i), (q) and (s).

"Any unlawful act or violation of any of the provisions of ORS 696.010 to 696.490 * * * by any licensee is not cause for the suspension or revocation of a license of any employer, employe, salesman, partner, member or officer associated with or employed by such licensee, unless it appears to the *satisfaction of the commissioner* that such employer, employe, salesman, partner, member or officer, had *guilty knowledge* thereof. *A course of dealing* shown to have been persistently and *consistently followed* by any real estate salesman, employe, partner, associate or officer *shall constitute prima facie evidence of such knowledge* upon the part of the employer, partner, associate or officer * * *." (Emphasis supplied.) ORS 696.310.

"(1) All moneys of whatever kind and nature pertaining to real estate transactions as defined in ORS 696.010 belonging to others and accepted by the broker while acting in his capacity as a broker, shall be deposited in a neutral escrow depository or in a separate bank account * * * and shall be retained in this bank account until the transaction involved is consummated or terminated, at which time the broker shall account for the full amounts received * * *.

ing approximately $13,000 of his personal funds in DVI's operational account toward the end of the period mentioned above. From his own testimony concerning his involvement in the monthly financial statements, it is obvious that petitioner had clear knowledge of DVI's financial straits during 1974 and early 1975.

Inasmuch as we have concluded that some of the findings and conclusions are insupportable, and some are incomplete, it will be necessary to remand the matter to the Commissioner for further action with reference to them and the penalty imposed because with a change in the findings the Commissioner must necessarily reconsider the penalty. For this reason it becomes imperative for us to examine each of the findings and give our opinion thereon:

(1) DVI had for many years maintained two client trust bank accounts. One was a checking account through which virtually all of its client trust funds were passed and the other was a savings account into which earnest money belonging to clients was sometimes deposited. These occasions usually resulted from a situation where the earnest money was going to be held for a considerable period of time while such things as litigation concerning the real estate deal was resolved. It appears that this account existed for a long time prior to 1961 and continually thereafter. The charges related to all of the deals in which clients' trust funds were placed in this account beginning in

---

"\* \* \* \* \*

"(3) Under no circumstances shall a broker permit any advance payment of funds belonging to others to be deposited in the broker's personal account or be commingled with funds he may have on deposit.
"\* \* \* \* \*

"(6) All earnest money deposits wherein a broker or salesman has a purchaser's interest, shall be placed in a neutral escrow in this state." OAR 863-10-025(1), (3) and (6).

We do not consider the Oregon Administrative Rules cited in the conclusions as adding anything to the applicable statutes so far as this case is concerned, except with reference to findings (5 and 6) and OAR 863-10-025(6).

1968. There were nine such instances. In several of these the evidence made it clear that the interest earned was paid to the clients. In others, it was equally clear that the interest went to DVI and only the principal was used in closing the deals. In still others, it was not clear from the records whether the interest went to the clients, attorneys involved in the closing of the deals or to DVI. It is uncontroverted that DVI's books had been audited by Real Estate Division personnel on numerous occasions over the years and that no commissioner had ever made any objections to the practices which were being followed with reference to the trust savings account.

■ ■  The Commissioner has pointed to no law or regulation which prohibits a real estate broker from maintaining a trust savings account or which delineates, if such an account is maintained, who shall have the benefit of the interest which is earned. We cannot agree with the Commissioner that the practice of having such an account violated either ORS 696.240 or OAR 863-10-025. However, the funds in the account were "held in trust." A trustee is accountable for and may not retain any profit made through or arising out of the administration of trust funds. *See Stephan v. Equitable S & L Assn.,* 268 Or 544, 522 P2d 478 (1974); Restatement (Second) of Trusts, §§ 203, 207 (1959). Further, if the interest at the instant it was earned became property which DVI claimed as its own and which became its property, it obviously at that point became commingled with the client's money in that bank account. This would, at least, technically, be a violation of ORS 696.300(1)(s). However, we cannot hold that that was a violation without examining the facts in the light of ORS 696.310 (quoted in note 1) which states that such acts are not cause for the suspension or revocation of a license unless it appears to the "satisfaction of the commissioner" that the petitioner had "guilty knowledge" thereof. It is true that DVI consistently used a savings account over a period of many years. But it is equally as true that the

commissioners over those same years knew about such fact but had never raised any objections to such a practice. The record does not tell us whether their audits disclosed that DVI retained some interest therefrom, but we know there was no concealment of that fact. This is at least evidence to refute any contention that there was a consistent course of conduct which could be treated as prima facie evidence of "guilty knowledge." It is important that the legislature did not simply say that the prohibited act is a cause for suspension if the petitioner has knowledge of it. The legislature put the word "guilty" in front of the word "knowledge."

■ When the legislation uses a term such as "guilty knowledge" it necessarily means something more than just "knowledge." This is what the Supreme Court of Oklahoma held in a case where initiative petitions were being challenged under a statute which said that petitions should be stricken if circulators of petitions had "guilty knowledge" that the signers were not properly qualified to sign. In *In Re Initiative Petition No. 272, State Question No. 409*, 388 P2d 290, 293 (Okla 1963), the court said:

> "* * * The phrase 'guilty knowledge' is synonymous with the term scienter. It means culpable ignorance of the truth or conscious awareness of falsity * * *."

The Commissioner found only that the petitioner as the designated broker had responsibility for DVI. He did not find that petitioner had a "guilty knowledge" of any unlawful commingling of funds in the savings account, let alone untrustworthy practices in that regard. Thus, he was not "satisfied" the petitioner had "guilty knowledge." Finding and Conclusion No. (1) cannot be sustained as they were made.

■ (2) With reference to the Sullivan Glove Company deal it appears from the testimony that the property involved was located in Deschutes County and that the Bend Title Company had sent a "preliminary closing letter" with accompanying documents to DVI together

[ 920 ]

with $10,000 earnest money that would become DVI's commission upon closing. The preliminary closing letter related certain events that must occur before the deal could be closed. The $10,000 was deposited in the client's trust checking account. A Mr. Todd was the supervisory person employed by DVI who handled closings. He apparently did not see the preliminary closing letter and authorized the closing of the deal without having completed all of the preliminary matters necessary, and the $10,000 was moved to DVI's operational account. DVI's bookkeeper called the letter to his attention and he immediately talked with the petitioner, at first in the presence of the bookkeeper. Mr. Ososke, who has, since later in 1975, become the designated broker for DVI, was also a supervisor in the office. He was called to the conference between Mr. Todd and the petitioner as the bookkeeper was leaving. When he was apprised of the situation and petitioner stated, "if it [the deal] doesn't close we'll put the money back," Mr. Ososke testified that he said, " 'this is the same thing we went over three days ago and I want no part of it.' And that is when I went to my attorney." The evidence showed that at this time DVI's operational checking account was overdrawn $5,204.37 and that the petitioner knew it. Thus, it is clear that he knew that the $10,000 not only was being unlawfully commingled with the DVI funds in the operational account but also that it was subject to immediate use by the bank for DVI's operational overdraft. The money was not immediately put back. The bookkeeper testified that the preliminary closing letter from the Bend Title Company which she had called to the attention of the supervisory personnel was still in her possession and that after her part in the conference she destroyed it. She testified that she had "picked up" in the conference that nothing was to be in the file dated before the ultimate closing date. When all of this testimony is considered together it is obvious that there was substantial evidence that the petitioner had guilty knowledge of the unlawful com-

[ 921 ]

mingling of the funds. The Commissioner found only that petitioner was *responsible,* not that he had *guilty knowledge,* although that is obviously a finding he could have made, or perhaps intended to make.

■ (3) With reference to at least two of the $25 parts of the $125 per month payments which went into the DVI operational account the evidence makes it appear to us that they actually did go into that account, and it certainly is substantial as a basis for the Commissioner's finding. But it is not clear that the petitioner had any "guilty knowledge," or knowledge at all, of this fact. However, it was a course of dealing that was followed, although only on two or three occasions. Thus, under the statute the Commissioner might interpret the course of the deal, insignificant as it is, as being "prima facie" evidence of "such knowledge," under the provisions of ORS 696.310, quoted and emphasized in note 1. Again, the Commissioner only found petitioner "responsible." Under the evidence and the applicable statute, he must find whether there was substantial evidence, or at the least "prima facie" evidence as defined in the statute, of "guilty knowledge." As to what is substantial evidence under the administrative code (ORS ch 183), *see Western Amusement v. Springfield,* 274 Or 37, 545 P2d 592 (1976), and *Cantrell v. Employment Division,* 24 Or App 215, 545 P2d 143, Sup Ct *review denied* (1976).

(4) The evidence with reference to this finding is that DVI contributed to a health insurance group plan for its employes and withheld the employes' contributions from their salaries. It further shows that from December 1, 1974 to February 4, 1975 such funds were withheld from the employes' pay and were not paid on the premiums and the insurance company canceled the policy. We note that the findings of fact state that between January 1, 1974 and February 4, 1975 such funds were withheld from salaries and that DVI "did not apply the same for payment of the medical insurance premiums, but rather retained such funds * * * and used same for its own business purposes * * *."

We find no evidence to support a finding that this practice continued for such a period of time. Rather, the evidence is that it continued for two months and four days. Afterward in February, March and April 1975 the employes' losses through such misused salary withholdings were repaid by not charging them for health insurance on their salaries for February, March and April.

Based upon his finding, the Commissioner concluded that the use by DVI of the withheld funds for its own business purposes constituted a violation of ORS 696.300(1)(h) and (q).

In light of the fact that funds withheld during December of 1974 and January of 1975 were "credited" to DVI's salesmen and employes over the following months, we cannot agree that the evidence, upon which a finding more limited than that made by the Commissioner would have to be based, supports the conclusion that a violation of ORS 696.300(1)(h) occurred. That statute only requires that moneys belonging to others be "account[ed] for or * * * remit[ted]" *within a reasonable time*; by crediting its employes with the deductions prevously taken DVI would appear to meet this requirement. That a violation of ORS 696.300(1)(q) occurred is, however, a conclusion well supported by the findings and evidence. Assuming without deciding that, as petitioner contends, a suspension may be based upon ORS 696.300(1)(q) only where the "act or conduct * * * constitut[ing] or demonstrat[ing] bad faith * * * untrustworthiness, or dishonest, fraudulent or improper dealings" is engaged in by a real estate broker acting in his capacity as a broker,[2] we are satisifed that DVI's misuse of funds withheld from "salaries and commissions" earned in the course of transacting real estate deals falls within the limits of the proscribed conduct.

---

[2] *See Klein v. Real Est. Comm. Holbrook,* 19 Or App 646, 528 P2d 1355 (1974); *Blank v. Black,* 14 Or App 470, 512 P2d 1016 (1973), Sup Ct *review denied* (1974).

Petitioner has acknowledged that he was aware of and approved the use of the withheld funds for DVI's own business purposes. Thus, the evidence under this heading could have supported the finding of a violation of ORS 696.300(1)(q). Again, the Commissioner must make a finding as to whether petitioner had "guilty knowledge" of the violation, if he finds there was one.

(5 and 6) The evidence established that two salesmen employed by DVI made personal real estate deals through DVI in which they gave their promissory notes as earnest money. The notes were not placed in a neutral escrow as required by OAR 863-10-025(6), quoted in note 1. There is no evidence that petitioner had knowledge of these violations of the regulation. The regulation in question is obviously valid. ORS 696.385(3), 183.400(3). Inasmuch as it was made pursuant to the applicable law, revocation or suspension of licenses thereunder must be subject to the restrictions of the same applicable law. Therefore, the only way "guilty knowledge" on the part of the petitioner can be found (and it was not found) in this instance is upon the same reasoning we have explained in (3) above, relating to a course of conduct being prima facie evidence thereof. Whether two demonstrated violations amount to a persistent and consistent course of conduct is open to question.

ORS 183.480(7) provides we may only reverse or remand an administrative order, inter alia, if it is unlawful in substance, or if it is not supported by substantial evidence. To summarize, we set aside the penalty imposed and find and hold with reference to the Commissioner's findings and conclusions that they are in all respects incomplete, that is, they are unlawful in substance. They are remanded for further consideration and completion. Upon completion of the order, if the Commissioner has found against petitioner in any respect in conformity with this opinion, he must then, in the light of the findings and conclusions thus made,

consider such penalty as is proper under his statutory authority.

Penalty set aside and remanded with directions.

**THORNTON, J.**, specially concurring.

I concur in remanding this proceeding, but differ with the reasoning of the prevailing opinion in one important respect.

I would not agree with the conclusion that there is no law or regulation which prohibits a real estate broker from maintaining a "trust savings account" in addition to his statutory trust fund account. In my opinion the practice of Dean Vincent, Inc. (DVI) to transfer funds to such account was in violation of ORS 696.240 and Oregon Administrative Rules, ch 863, § 10-025.

ORS 696.240 provides as follows:

"Every person, partnership or corporation licensed as a real estate broker, who does not immediately place all funds entrusted to him in his capacity as a real estate broker by his principal or others in a neutral escrow depository in this state, shall maintain a trust fund account with some bank or recognized depository located in this state and place all such entrusted funds therein upon receipt. The Real Estate Division shall establish rules and regulations to provide for records to be maintained and the manner in which such deposits shall be made."

The rules of the Real Estate Division so far as pertinent here provide:

"All moneys of whatever kind and nature pertaining to real estate transactions as defined in ORS 696.010 belonging to others and accepted by the broker while acting in his capacity as a broker, shall be deposited in a neutral escrow depository or in a separate bank account to be entitled CLIENT'S TRUST ACCOUNT * * * and shall be retained in this bank account until the transaction involved is consummated or terminated, at which time the broker shall account for the full amounts received. * * *" OAR 863-10-025(1).

As I read the above statute and regulation, DVI had no statutory authority to deposit funds obtained from customers in connection with real estate transactions anywhere but in either (a) a "neutral escrow depository," or (b) the statutory "trust fund account." DVI would have no more authority to transfer these funds to another account than it would to invest them in the stock market or in United States savings bonds. The violation was complete when DVI transferred these funds to the savings account. As I view this issue, we do not need to go into the question of who is entitled to the interest earnings, or whether the general law of trusts applies in these circumstances. Further, I do not necessarily agree with the conclusion in the prevailing opinion on this latter issue. *See,* 10 Am Jur2d 320, Banks, General and Special Deposits § 360 et seq (1963).

Except as indicated above I concur in the prevailing opinion and join in the remand.